**Eugene S. FORRESTER,
Plaintiff–Appellee,**

v.

**Ronald G. STOCKSTILL, M.D. and Mid-south Regional Blood Center, and Robert Kisabeth, M.D., Defendants–Appellants.**

Supreme Court of Tennessee,
at Jackson.

Jan. 3, 1994.

Eugene Greener, Jr., Harriette R. Coleman, Goodman, Glazer, Greener, Schneider & Kremer, P.C., Henry C. Shelton, III, Evans & Petree, Memphis, for plaintiff-appellee.

John W. Leach, May, Norfleet, Leach, Fletcher & Maxwell, Thomas J. Walsh, Jr.,

McDonnell Boyd, Memphis, for defendants-appellants.

## OPINION

REID, Chief Justice.

This case presents for review the judgment of the Court of Appeals sustaining jury verdicts in favor of the plaintiff, Eugene S. Forrester, for compensatory damages against the two individual defendants, Dr. Ronald Stockstill and Dr. Robert Kisabeth, vacating and remanding for a new trial the award of punitive damages against the individual defendants, and vacating the jury verdict for compensatory damages and dismissing the claim against the corporate defendant, Midsouth Regional Blood Center. Upon review of the record, this Court finds the evidence insufficient to support the judgments of liability and directs that the suit be dismissed.

Forrester, the executive director of Midsouth Regional Blood Center (Lifeblood), a not-for-profit corporation, sued Lifeblood; Stockstill, who was Lifeblood's medical director and a member of its board of directors; and Kisabeth, who was a former medical director and a member of Lifeblood's board of directors. The complaint charged the individual defendants with inducing the breach of Forrester's employment contract, the intentional interference with Forrester's business relationship, defamation, conspiracy to terminate Forrester's employment and several other claims.

The case went to the jury as to the individual defendants on the charges of intentional interference with business relationship, inducing the breach of employment contract, and conspiracy to defame Forrester and thereby procure his discharge from employment; and as to Lifeblood, on the charge of conspiracy.

The jury returned a general verdict awarding Forrester $200,000 compensatory damages and $150,000 punitive damages against Stockstill, $200,000 compensatory and $150,000 punitive damages against Kisabeth, and $200,000 compensatory damages against Lifeblood.

The Court of Appeals held that the case properly was submitted to the jury on the charges against Stockstill and Kisabeth of conspiracy, intentional interference with a business relationship and inducing the breach of employment contract, but vacated the awards of punitive damages and remanded the case for a hearing on punitive damages pursuant to *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992). The Court of Appeals reversed the trial court and sustained Lifeblood's motion for summary judgment on the charges of conspiracy. The case is before this Court on the charge that the defendants Stockstill and Kisabeth intentionally interfered with the business relationship, induced the breach of his employment contract, and conspired to procure Forrester's discharge.

The substance of all of the issues raised by the appellants Stockstill and Kisabeth, is that the evidence does not support the judgments of liability. The issue, then, is whether there is material evidence to support the jury verdicts. Rule 13(d) of the Tennessee Rules of Appellate Procedure provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." As this Court stated in the recent case of *Hodges v. S.C. Toof & Co.*, "It is well established that when reviewing a judgment based on a jury verdict, appellate courts are limited to determining whether there is material evidence to support the verdict." 833 S.W.2d at 898.

It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the

parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co. v. C. & R. Constr., Inc.,* 575 S.W.2d 4, 5 (Tenn.1978).

Forrester was employed by Lifeblood on January 1, 1975, pursuant to a contract which provided: "Either party may terminate this Agreement without cause upon 60 days written notice not earlier than December 31, 1976." On May 22, 1986, Lifeblood's board of directors gave Forrester the required notice and terminated his employment contract pursuant to that notice. At the time Forrester was discharged, he was an employee-at-will.

In Tennessee, unless there is a contract of employment for a definite term, a discharged employee may not recover against an employer for breach of contract because there is no contractual right to continued employment. In order to recover for procurement of a breach of contract, the plaintiff must prove that, there was a legal contract for a designated term, the tortfeasor was aware of the contract, the tortfeasor maliciously intended to induce a breach of the contract, there was a breach proximately caused by the tortfeasor's acts, and the plaintiff was damaged as the result of the breach. "We know of no court decision, nor have we been referred to one, which holds that an employee has a contractual right [to continued employment] under the employment at-will doctrine." *Bennett v. Steiner–Liff Iron and Metal,* 826 S.W.2d 119, 121 (Tenn.1992). Therefore, the trial court erred in submitting the case to the jury on the claim that the defendants induced the breach of employment contract, and the Court of Appeals erred in affirming the action of the trial court.

The determinative legal theory is the intentional interference with at-will employment. If that claim fails, then the claim for conspiracy must also fail, for "[i]t cannot be that a conspiracy to do a thing is actionable where the thing itself would not be." *Felts v.*

*Paradise,* 178 Tenn. 421, 158 S.W.2d 727, 729 (1942).

Appellants Stockstill and Kisabeth contend that, since Forrester was an employee-at-will, there can be no cause of action for interference with employment against his employer, Lifeblood, or them as members of Lifeblood's board of directors. Forrester responds that the employment at-will doctrine does not protect Stockstill and Kisabeth because they were acting outside the scope of their duties when they procured his discharge.

Subject to a few narrow exceptions, which are not relevant to this case, (*see Anderson v. Standard Register Co.,* 857 S.W.2d 555, 556 (Tenn.1993)), an employer or an employee may terminate an employment at-will relationship at any time for good cause, bad cause or no cause. *Chism v. Mid–South Milling Co., Inc.,* 762 S.W.2d 552, 555 (Tenn.1988); *Whittaker v. Care–More, Inc.,* 621 S.W.2d 395, 396 (Tenn.App.1981). However, intentional interference with at-will employment by a third party, without privilege or justification, is actionable.

The essential issue in this case was discussed by the Court in *Ladd v. Roane Hosiery, Inc.,* 556 S.W.2d 758 (Tenn.1977).[1] In that case, the discharged employee sued her former employer and also her former supervisor. The plaintiff, who was an employee-at-will, alleged that her supervisor induced her employer to discharge her. The complaint stated that the supervisor, "induced the corporation to terminate or breach the contract of employment between [her] and the corporation," and that he "had neither reason, nor excuse [for doing so], and was actuated only through a spirit of vindictiveness and malice...." *Id.* at 760. In reversing the trial court's finding that the allegations were not sufficient to state a claim against the supervisor, the Court stated:

An individual has a property interest in his labor, and the right to work without unjustified interference. *Large v. Dick,* 207 Tenn. 664, 343 S.W.2d 693 (1960). One who intentionally interferes with this right,

---

**1.** The defendants also rely on *Poling v. Goins,* 713 S.W.2d 305 (Tenn.1986); however, *Poling* does not deny the existence of the tort of inten-

tional interference with employment, it merely states that in that particular case, the plaintiff did not state a cause of action.

causing the employee to be discharged, is liable in tort for the resulting damages. *Dukes v. Brotherhood of Painters,* 191 Tenn. 495, 235 S.W.2d 7 (1950). The essential allegations of such a claim are that the defendant intentionally and without justification procured the discharge of the employee in question. *Dukes v. Brotherhood of Painters, supra,* 57 C.J.S. Master & Servant § 630....

*Id.*

The Court recognized in that case that the relationship between the employee or officer of a corporate employer to the discharged employee is a significant fact. The Court stated:

It is possible that [the supervisor] would not be liable for procuring the dismissal of the plaintiff if that action was within the scope of his duties at [the corporation]. *See, e.g., Lyon Ford, Inc. v. Ford Marketing Corp.,* 337 F.Supp. 691 (E.D.N.Y.1971); Annot., 26 A.L.R.2d 1227, 1267 (citing cases)....

*Id.*

Since, with the exceptions noted, the discharge from employment of an employee-at-will by the employer is not actionable, but the wrongful interference with at-will employment by third persons is actionable, Forrester's suit against Stockstill and Kisabeth can be maintained only if the proof establishes that they stood as third parties to the employment relationship at the time they performed the acts found to have caused Forrester's discharge.

In determining if the record contains material evidence to support the jury verdict, the evidence must be viewed in the light most favorable to the plaintiff. Tenn. R.App.P. 13(d); *Crabtree Masonry Co. v. C & R Const., Inc.,* 575 S.W.2d at 5; *Haga v. Blanc & West Lumber Co., Inc.,* 666 S.W.2d 61, 63 (Tenn.1984). For the purpose of this review, the Court will accept the plaintiff's statement of the facts.

■ The evidence which Forrester presents as the basis for the jury verdict can be summarized as follows. On January 1, 1975, when Forrester was employed by Lifeblood's board of directors as the corporation's first executive director, Lifeblood was a small volunteer community blood plan with no professional direction and with minimal resources. As executive director, he reported directly to the board of directors and the personnel committee of the board. Under Forrester's management, Lifeblood became the major source of donated (as distinguished from purchased) blood in the Memphis area. Forrester's competence as an administrator was not challenged until 1986. For the time period commencing with Forrester's employment and ending when he was discharged in 1986, Forrester's personnel file contained only complementary material provided by Lifeblood's officers and directors, who attributed the organization's success in large part to Forrester's performance as executive director. During Forrester's tenure as executive director, the corporation experienced impressive financial success.

In 1977, the second year of Forrester's employment, the defendant Kisabeth, who was a member of the board of directors, was appointed to the position of medical director on a part-time basis. The positions of executive director and medical director were "co-equal." The executive director was in charge of finance, operations, and administration. The medical director was the "blood banker—that is, a physician specializing as a pathologist or hematologist with additional study in the medical arts of human blood donation, storage and transfusion." Like the executive director, the medical director reported to the board of directors.

In 1979 and 1980, at the suggestion of Kisabeth and board member Dr. Eric Muirhead, the board established a series of objectives for Forrester to accomplish. Kisabeth, and perhaps Muirhead, wanted to terminate Forrester's employment at that time, even though Forrester surpassed the objectives set by the board.

In 1982, Kisabeth and Muirhead recommended to the board of directors that the organizational structure of the corporation be changed so that Lifeblood's entire operation would be under the direction of a physician. Though this recommendation was approved by the executive committee of the board, after full debate, in which Forrester partici-

pated, the recommendation was rejected by the board. After the recommendation had been defeated, the chairman of the board told Forrester that "they," apparently referring to Kisabeth and Muirhead, would try again later.

In 1982, Kisabeth resigned as medical director and Stockstill was appointed. Both Stockstill and Kisabeth continued to serve as members of the board of directors. The corporation continued to prosper between 1982 and 1986.

At a meeting of the executive committee in April, 1986, at which Stockstill submitted his resignation as medical director, and again at a meeting of the board of directors in May, 1986, at which Stockstill reported his reasons for resigning as medical director, Stockstill made certain statements regarding Forrester's performance as executive director, including the following: Forrester cut off blood to patients at Methodist Hospital because he was angry at members of the staff at the Methodist Hospital; Forrester "ha[d] a vindicative streak and would hold up shipments of blood because of anger towards a hospital"; Forrester told Stockstill, "We don't like them [at Methodist Hospital] and they don't like us"; in retaliation for a complaint from the City of Memphis Hospital (the MED) that there was to be no live coverage by employees at Lifeblood while Lifeblood held a Christmas party, Mr. Forrester arranged that the MED could not get platelets (a significant blood product) on consignment for liver transplants, and said, "I'll get even with the MED"; Forrester caused Lifeblood to cease providing blood for critically ill members of Ridgeway Baptist Church, including a liver patient, a coronary bypass patient, and a stabbed policeman, because the church was delinquent in its blood donations; and Forrester concealed the list of names of blood donors from Dr. Callahan at St. Jude Hospital. Furthermore, Stockstill failed to state at those meetings the following: patients from Ridgeway Baptist Church still received blood transfusions, but simply had to pay for the blood; Forrester's actions with respect to Ridgeway Baptist Church strictly followed the written policy of the executive committee, and Forrester did not believe he had legal authority to release the donor lists requested by Dr. Callahan.

Forrester further asserts that the evidence in the record would permit the jury to find that Stockstill and Kisabeth misled the board into believing that all of the prior medical directors "did not get along with" Forrester; that Forrester jeopardized Lifeblood's relationship with Eastwood Hospital by complaining in a letter to the hospital that an official of Eastwood had "stood him up"; that Forrester was a "racist," although more than 50 percent of Lifeblood's employees and supervisors were African–Americans; that Forrester acted improperly in having his car washed by Lifeblood employees; that Forrester did not report a hit-and-run automobile accident involving an employee of Lifeblood; and that Forrester did not properly investigate an alleged racist remark. Forrester asserts as further evidence on which the jury could base its verdict the following: Forrester, though an ex-officio member of the board of directors, was not invited to the executive committee when the above items were presented, or to the board meeting at which his employment was terminated; the lay members of the board of directors who composed approximately three-fourths of the board, were "impressed" by the physician members of the board "who seemed to be unanimously against Mr. Forrester"; the board declined to appoint a committee to investigate "the charges"; and legal counsel told the board members that they were not required to afford Forrester a hearing and "should vote based on their own knowledge."

After an extended discussion, the board voted 24 to 3 to give Forrester the required 60 days notice and terminate his employment.

The courts have relied upon various factors in finding or denying liability of corporate officers, directors, and employees for intentional interference with employment by the corporation. After reviewing the history of the cause of action and the basis for liability, Prosser & Keeton conclude:

> With intent to interfere as the usual basis of the action, the cases have turned almost entirely upon the defendant's motive or purpose, and the means by which

he has sought to accomplish it. As in the cases of interference with contract, any manner of intentional invasion of the plaintiff's interests may be sufficient if the purpose is not a proper one. Apart from this, however, the means adopted may be unlawful in themselves; and violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith, all have been held to result in liability, and there is some authority which limits liability to such cases.

Most of the decisions, however, have turned upon the defendant's motive or purpose. Again, as in the case of interference with contract, the defendant has been held liable if the reason underlying his interference is purely a malevolent one, and a desire to do harm to the plaintiff for its own sake. On the other hand, some element of ill will is seldom absent from intentional interference; and if the defendant has a legitimate interest to protect, the addition of a spite motive usually is not regarded as sufficient to result in liability.

W. Page Keeton, *Prosser & Keeton on The Law of Torts* § 130, pp. 1009–10 (5th ed. 1984) (footnotes omitted).

The case law on intentional interference with corporate employment by a director, official, or employee is annotated at Thomas G. Fischer, Annotation, *Liability of Corporate Director, Officer, or Employee for Tortious Interference with Corporation's Contract with Another,* 72 A.L.R.4th 492 (1989). A summary of the factors found to be determinative are mentioned at the beginning of the annotation.

Some courts have recognized that generally a corporate director, officer, or employee is not liable for tortiously interfering with a corporate contract, because he is considered a party to the contract, as long as he is acting to serve the corporate interests, or unless his activity involves individual separate tortious acts. Courts have also recognized, however, that a corporate director, officer, or employee may be liable for tortiously interfering with a corporate contract if he is acting outside the scope of

his authority, acting with malice, or acting to serve his own interests.

*Id.* at 501 (references to sections omitted).

There is no substantial disagreement between the parties regarding the statement of the law applicable to this case. Forrester states that a corporate agent acting in good faith and within the scope of his authority or in furtherance of the corporation's interest cannot be held liable for intentionally interfering with another person's employment by the same corporation. Stockstill and Kisabeth say that there is no liability so long as a corporate officer, director, or employee is acting in furtherance of the corporation's interest. However, Forrester contends that the evidence shows that Stockstill and Kisabeth acted "maliciously," not in good faith, and outside the scope of their duties. Stockstill and Kisabeth respond that the proof shows that their action with regard to Forrester was within the scope of their duties as directors, and was privileged and justified.

It appears that the critical factors in cases concerning intentional interference with corporate employment by a director, officer, or employee are intent, motive or purpose, and means.

The first factor, intent, clearly is established by the proof. The record shows that Stockstill and Kisabeth intentionally interfered with Forrester's employment with Lifeblood.

The only means whereby they interfered with the employment, however, were their statements to the other board members at the executive committee and board meetings regarding specific incidents involving Forrester's performance as executive director. All of the incidents related, accurately or inaccurately, to the board members by Stockstill and Kisabeth, involved the performance by Forrester of his assigned duties. The distribution of blood to area hospitals pursuant to policies adopted by the board was Forrester's responsibility; Forrester was responsible for the list of blood donors; Forrester's duties included the supervision of all employees except the medical director; and Forrester was under some duty to cooperate with

the medical director. A discussion by the board members of Forrester's performance of his duties was appropriate; Stockstill and Kisabeth were obligated to report to the other board members significant incidents relating to Forrester's performance, and the board was obligated to consider the advisability of retaining Forrester as the corporation's executive director. The subject matter reported by Stockstill and Kisabeth and considered by the board was relevant and material to its decision regarding Forrester's continued employment. It, therefore, appears that the *means* of accomplishing the interference, i.e., reporting to the board incidents in which Forrester, in the view of Stockstill and Kisabeth, was deficient in the performance of his duties, were reasonably designed to accomplish that purpose and were not inappropriate.

Forrester does not deny that the incidents reported had some basis in fact, and he obviously does not deny that they related to the performance of his duty. He contends, instead, that the accounts given the board were "falsehoods and distortions," motivated by malice towards him. However, the accounts given by Stockstill and Kisabeth were false only to the extent that they varied from the accounts, for the purposes of this review deemed accurate, given by Forrester and apparently accepted by the jury. Forrester says that Stockstill told the board that Forrester "offended the management of Eastwood Hospital by an angry, unnecessary letter he wrote." Forrester does not deny that he wrote the letter, or that it was angry, unnecessary, and offensive. The additional truth was that the letter did not change the relationship between Lifeblood and Eastwood Hospital. In another incident, Forrester says that Stockstill reported to the board that a Lifeblood employee washed Forrester's car. The whole truth, according to Forrester's explanation to the jury, was that he was under the impression that use of a car furnished by Lifeblood included its being washed by a Lifeblood employee. Forrester says Stockstill reported to the board that he concealed from St. Jude Hospital the list of blood donors, while the whole truth was that he refused to give St. Jude the list because he did not think that he had the authority to

release that information. Perhaps the most serious charge was that Stockstill reported that Forrester stopped supplying blood to critically ill members of a particular church "in such a way that board members were not clearly told that the patients still received blood transfusions, but simply had to pay for them." Examination of the record with regard to the other reported incidents indicates that the incidents did occur, but that Stockstill's and Kisabeth's accounts of the incidents were less favorable to Forrester than his more complete explanations.

Forrester relies upon this same failure to give accurate and complete accounts of the incidents, as proof that malice motivated Stockstill and Kisabeth. Such evidence does not support a finding that Stockstill and Kisabeth acted out of malice rather than in furtherance of the corporation's interest.

There is no evidence in the record that Stockstill or Kisabeth had any relationship with Forrester except through their connection with Lifeblood. There is no evidence that Stockstill or Kisabeth harbored any malice, ill will, or other attitude or emotion towards Forrester except within the context of Lifeblood. There is no evidence that Stockstill or Kisabeth would benefit personally from Forrester's discharge. Most importantly, there is no evidence that Stockstill or Kisabeth were acting for any purpose other than their perceived best interest for Lifeblood. The only purpose supported by the proof in this case which Stockstill and Kisabeth had for interfering with Forrester's employment was that the interest of Lifeblood would be served by terminating Forrester's employment as executive director.

■ A corporation can act only upon the advice of its officers and agents, and its officers and directors have a duty to serve the corporation. Important societal interests are served by corporations having the clear and candid advice of their officers and agents. Fear of personal liability would tend to limit such advice. Consequently, when an officer, director, or employee of a corporation acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the

corporation, in claims of intentional interference with employment, the action of the officer, director, or employee is considered to be the action of the corporation and is entitled to the same immunity from liability.

This case is very similar to *Feaheny v. Caldwell*, 175 Mich.App. 291, 437 N.W.2d 358 (1989), in which a discharged vice-president of Ford Motor Company who had served at the will of the board of directors, sued his superior officers alleging tortious interference with his employment contract and tortious interference with his economic expectancy based on his continued employment by Ford. The Michigan court recognized a cause of action for the interference with an employment contract that is terminable at will. In language particularly appropriate to this case, the court stated:

> The obstacle that plaintiff faced was to establish wrongful interference on the part of the five defendants. As noted above, this required proof that each defendant did *per se* wrongful acts or did lawful acts with malice and without justification. Also required was proof, with specificity, of affirmative acts by the defendants which corroborated the unlawful purpose of the interference. Further, since all five defendants were corporate officers, plaintiff faced the very difficult obstacle of showing that each defendant stood as a third party to the employment contract at the time he allegedly performed the acts. This is so, because, as corporate officers, the defendants served as agents whose acts were privileged when acting for and on behalf of the corporation, rather than acting to further strictly personal motives.

In *Feaheny,* the court found that proof of acts directed towards seeking the plaintiff's termination, did not establish that the defendants, as corporate officers, were motivated by personal interests rather than the corporation's interests:

> .... Viewed most favorably to plaintiff, the evidence failed to demonstrate that any of the defendants acted out of a personal motive to harm defendant or to otherwise acquire pecuniary advantage. Their opinions and actions taken regarding how the company should be organized, plaintiff's job performance and whether plaintiff

should be recommended for stock options and merit increases were judgments that they had a right to make as corporate officers....

It is one thing for a person outside the corporation to come in and poison the minds of the board of directors with negative opinions about one of its top executives. It is another thing for plaintiff's superiors to execute their independent judgment to give negative appraisals to the board of directors, to decide that plaintiff should not be recommended for merit increases or other benefits, and to work towards a reorganization of the company that may adversely affect plaintiff's job responsibilities and opportunities.

After a careful consideration of the trial record, we hold that plaintiff failed to establish a *prima facie* case against any of the defendants. Although the actions taken by defendants did amount to interference with his expectations under the at-will employment contract, their actions did not fit into the category of the wrongful interference that is required to maintain a tortious interference cause of action. Hence, there was no liability as a matter of law. *Id.* at 364–65 (citations and footnotes omitted).

In order to sustain the jury's finding of liability in this case, the plaintiff was required to present material evidence that Stockstill and Kisabeth intentionally interfered with his employment by Lifeblood and that Stockstill and Kisabeth were not acting in the furtherance of Lifeblood's interest. The record shows that they intentionally interfered with his employment, but the record is void of material evidence that Stockstill or Kisabeth were not acting in furtherance of their view of Lifeblood's interest.

The judgments against the defendants are reversed, and the suit is dismissed. Costs are taxed against the plaintiff.

DROWOTA, O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.