# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 10, 2001 Session

## KURT SERAPHINE v. AQUA BATH COMPANY, INC., ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 99-2272-III      Claudia C. Bonnyman, Special Chancellor**

---

### No. M2000-02662-COA-R3-CV - Filed March 28, 2003

---

This is an appeal from the grant of Appellees' motion for summary judgment. Appellant, a former employee of Appellee company, brought various claims against the company, and the company's top executives. Against the company, Appellant sought damages and specific performance based on an alleged breach of a stock option agreement and damages for breach of the implied duty of good faith and fair dealing. Against the individual defendants, Appellant sued on claims of statutory and common law inducement to breach. Appellees counterclaimed for a declaratory judgment that Appellant had no option to purchase shares in the company because the option expired when his employment terminated. Summary judgment was granted on Appellees' declaratory judgment claim and Appellant's claims were dismissed. We reverse the trial court's holding that the stock option expired with termination of employment, but find Appellant has not demonstrated a breach of the stock option agreement or his right to any remedy thereunder. We affirm the trial court's grant of summary judgment on the breach of duty of good faith and intentional interference claims.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and J. S. DANIEL, SP. J., joined.

Steven A. Riley, Taylor A. Cates, Nashville, Tennessee, for the appellant, Kurt Seraphine.

Brian A. Lapps, Jr., Jason D. Fisher, Nashville, Tennessee, for the appellees, Aqua Bath Company, Inc., George McAllister and Charles Dorris.

**OPINION**

I. Background

This is an appeal from the grant of summary judgment to an employer, Aqua Bath Company, Inc. ("Aqua Bath").[1] Appellant, Kurt Seraphine, is a former employee of Aqua Bath. Aqua Bath is a closely held corporation that designs and builds handicap-accessible thermal-formed bath tubs and showers for use by individuals with disabilities.

In July 1996, Mr. Seraphine was recruited by Aqua Bath's president, Mr. McAllister, to work as an executive for Aqua Bath. At the time Mr. Seraphine was approached, Aqua Bath was a small and relatively new business. Mr. McAllister and Mr. Seraphine engaged in oral negotiations regarding the terms of Mr. Seraphine's employment, including compensation. On July 22, 1996, Mr. McAllister sent Mr. Seraphine the following letter:

> I am pleased to offer you employment with the Aqua Bath Company effective Monday, July 22, 1996, to be as we have discussed:
>
> 1) Base annual salary of $60,000.
> 2) Your health insurance to by paid for by the company.
> 3) A stock option of 50 shares at a cost to you of $500 per share to be exercised when the sales level reaches $6,000,000. If the company should be sold before this sales level, your stock option shall be prorated when the sales figure is above $4,000,000. As an example, if the company should be sold when the sales level is $5,000,000, you would have 50% of your option or 25 shares that you could purchase at $500 per share.
> 4) You will be given a bonus of 1% of sales above $4,000,000 to $8,000,000.
> 5) Your initial assignment will be with the sales department to participate in all levels of sales as may be appropriate to increase the company's share of the market.
> 6) You will accumulate vacation at the rate of 2 weeks per year. It is expected that you will take one week during the shutdown between Christmas and New Years.
>
> I feel this covers the job as we have discussed. If there are other questions, we will discuss them.
> Welcome Aboard. We expect you to become an important part of our team.
>
> Sincerely,
> George P. McAllister
> President

---

[1] The suit also included claims against company officers, Aqua Bath's Chief Executive Officer and Chairman of its Board of Directors, Charles William Dorris, and its former President, George P. McAllister, which were also dismissed by grant of summary judgment.

In 1997, Aqua Bath promoted Mr. Seraphine to Chief Operating Officer. At the end of April 1999, Mr. Seraphine's employment was terminated. Mr. Seraphine alleges that he was terminated at that time because April 30, 1999, was the last day of a fiscal year in which gross sales had reached $5,820,593, which he claims was 97% of the target mark at which he could exercise his option. In a letter dated July 19, 1999, Mr. Seraphine notified Aqua Bath of his intent to exercise his stock option and requested that Aqua Bath contact his attorney to make arrangements for the exchange of the purchase price and the stock. Aqua Bath rejected Mr. Seraphine's option, claiming that it had expired upon his termination of employment. Mr. Seraphine filed suit.

Against Aqua Bath, Mr. Seraphine sued for damages and specific performance based on breach of the stock option agreement and for breach of the implied duty of good faith and fair dealing. Against Mr. McAllister and Mr. Dorris, Mr. Seraphine sued for statutory and common law inducement to breach and for breach of fiduciary duty.[2] The defendants answered and counterclaimed, seeking a declaratory judgment that Mr. Seraphine's rights under the option agreement had expired, and alleged a claim against Mr. Seraphine for breach of fiduciary duty.

The defendants filed a motion for summary judgment claiming that, as a matter of law, Mr. Seraphine's stock option expired upon his termination and that no implied duty of good faith and fair dealing exists in an at-will employment relationship. Mr. Dorris and Mr. McAllister further claimed that without an enforceable contract, Mr. Seraphine's inducement claims failed as well and that, because Mr. Seraphine was never a minority shareholder of Aqua Bath they owed no fiduciary duty to him.

Mr. Seraphine also filed a motion for partial summary judgment on the issue of liability, claiming that as a matter of law, the stock option agreement survived termination and requested that the trial court declare that he may exercise his option when Aqua Bath reaches $6,000,000 in sales, or may exercise a pro rata portion of his option immediately.

The trial court granted the defendants' motion and denied Mr. Seraphine's motion.[3] Mr. Seraphine then filed Notice of Appeal with this court.

## II. Summary Judgment

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993);

---

[2]The trial court found that there was no genuine issue of material fact that Mr. Seraphine was never a shareholder, beneficial or otherwise, of Aqua Bath and that neither Mr. Dorris nor Mr. McAllister breached any fiduciary duty. Mr. Seraphine has not appealed this holding.

[3]Mr. Seraphine filed a second motion for summary judgment asking the trial court to dismiss Aqua Bath's counterclaim of breach of fiduciary duty. The court refused to modify the case management order to hear the motion, but Aqua Bath non-suited this claim without prejudice. Consequently, this issue is not part of this appeal.

*Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001). A party seeking summary judgment has the burden of demonstrating that its motion satisfies the requirements of Rule 56, including its entitlement to judgment as a matter of law. *Carvell v. Bottoms*, 900 S.W.2d 23, 25 (Tenn. 1995).

Summary judgments enjoy no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 285 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). Accordingly, appellate courts must review the record and make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). Our perspective is the same as that of the trial court. *Gonzales v. Alman Const. Co.*, 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993).

## III. The Contract

In this case, the trial court determined that there were no genuine material issues of fact and that Mr. Seraphine was not entitled to purchase Aqua Bath stock because any potential stock option terminated at the time his employment terminated. Thus, the primary dispute is whether Mr. Seraphine's stock option survived the termination of his employment. Resolution of this issue involves a question of contract interpretation. The parties do not dispute the contents of the employment letter, which is the contract at issue.

Interpretation of the agreements reflected by the employment letter is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of this document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). The rights and obligations of the parties are governed by their written contract and, therefore, it is incumbent upon the courts to enforce contracts according to their plain terms. *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995).

The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. The intent of the parties is presumed to be that specifically expressed in the body of the contract. . . . If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

*Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citations omitted).

Where a contractual provision is susceptible to more than one reasonable interpretation, it is ambiguous, and the parties' intent cannot be determined by a literal interpretation of the language. *Id.* In that situation, courts must resort to other rules of construction. *Id.* Only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.* However, a strained construction may not be placed on the language used by the parties to find or create ambiguity where none exists. *Id.* 78 S.W.3d at 891.

Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002). Any provisions which are ambiguous or vague will be construed against the party responsible for drafting them. *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 153, 425 S.W.2d 590, 592 (Tenn. 1968); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 598 (Tenn. Ct. App. 1999).

The employment letter clearly grants a stock option to Mr. Seraphine and makes exercise of the stock option contingent upon the sales level of the company reaching $6,000,000. It does not, however, include any language specifically making the exercise of the option contingent upon continued employment at the time sales reach the required level. The letter is, in fact, silent on this issue.

Mr. Seraphine argues that Aqua Bath seeks the addition of a condition not set out in the agreement, *i.e.*, continued employment until the sales level is reached. Aqua Bath also asserts that Mr. Seraphine would have this court imply a term into the contract not placed there by the parties, arguing that in the absence of a specific agreement that an employee's potential stock options can vest after employment ends, such options do not vest.

Relying on *Broyles v. Synercon Corp.*, 512 S.W.2d 288 (Tenn. 1974), Aqua Bath asserts that the Tennessee Supreme Court has adopted the general rule of stock option agreement interpretation to the effect that after termination of employment an optionee is entitled to exercise only such options as he could have exercised at the date of termination of employment. We do not entirely

agree with Aqua Bath's interpretation of the court's holding in *Broyles* or the application of that holding to the facts of this case.

*Broyles* involved the construction of specific language in the company's stock option plan. Mr. Broyles, an employee, was granted an option to purchase a maximum number of shares during a five-year period. The employee could purchase 20% of the option stock per year, or could delay purchase of each year's quota, even until the fifth year.

Mr. Broyles resigned from employment in his second year of employment under the stock option plan. During his first year in the plan, he did not exercise his option to purchase 20% of his option stock. After his resignation, he attempted to purchase the entire option stock or five years worth. The company issued him 40% of the total, that is, 20% per year from the grant of the option until his resignation.

The Supreme Court determined that the language of the plan permitted exercise of the option in full in two circumstances: the running in full of the five year period or death. Thus, the court defined the issue as "whether a third circumstance - - termination of employment by resignation - - also entitled the optionee to full exercise of the option." 512 S.W.2d at 290.

In answering that question, the Court first looked at the stated purpose of the five-year stock option plan and found that the clear purpose was to provide incentive for key employees to remain with the company. *Id*. The Court then determined that it must look to the whole instrument and found that the plan had specific language regarding exercise of the full option and also had specific language regarding termination of employment, which stated:

> In the event the employment of the holder of an option is terminated, other than by reason of death, the option may be exercised by the holder at any time within three months after such termination but not more than five years after the grant thereof.

*Id*.

Mr. Broyles insisted that the words "the option may be exercised" meant it could be exercised in full after resignation. The Court disagreed with that interpretation for several reasons. First, that interpretation would allow someone who left during their second year in the plan to purchase 100% or five years' worth of stock, while those people who remained employed could only purchase 20% during each year. This result would be contrary to the purpose of the plan, i.e., to retain employees, because it would place a premium on resignation, not on continued employment. *Id*. 512 S.W.2d at 291.

The Court interpreted the plan to allow an employee who resigns to exercise his option "to the same extent he could have as an employee . . ." and stated that this interpretation agreed with a written interpretation by the Board of Directors which had been circulated to all optionees before Mr.

Broyles resigned. The Court also found that this construction comported with the general rule stated in a well-known authority, as follows:

> Provisions in an agreement allowing an optionee, after termination of his employment under certain circumstances, to exercise any theretofore unexercised rights to purchase stock, have usually been construed in the light of the entire instrument so as to permit the optionee, after termination of his employment, to exercise only such options as he was entitled to exercise at the date of termination of employment, or which might have accrued during any additional grace period provided for in the post-employment clause. *Contentions that such a provision should be construed independently of the rest of the agreement so as to accelerate the optionee's right to purchase all stock allotted to him have not been favored.*

*Id*. at 291 (quoting 96 A.L.R.2d 176, Section 11 at 192 (1964)).

Aqua Bath relies upon the Court's use of this quoted statement as a general rule to be applied herein, but we find that reliance to be misplaced. First, this quotation from A.L.R. relates to interpretation of specific provisions for the exercise of options after termination of employment. Because in *Broyles* the plan included a specific provision on termination of employment, the question before the court in that case was not whether the employee could exercise the option, but how much of the option he could exercise. There is no such provision in the employment letter at issue in the present case. The letter tells us the extent of the option, but lacks any language at all regarding his exercise of the option after his employment was terminated.

More important is the court's focus on the purpose the company intended to fulfill with its stock option plan and the actual language used in the contract. The court explained that "in construing such options, the Court must look to the original purpose of the agreement" and the court should "look to the actual language used by the parties in light of the purposes intended by the option." *Id*. In *Broyles*, the company's basic intent was found in its option plan in two different sections of the option agreement in language that expressly stated that the purpose was "to induce employment of the optionee and to furnish incentive for his continued employment." *Id*. at 290.

The principle that the language and purpose of the specific agreement at issue govern the question is also exemplified by three other opinions. In *McMillin v. Great Southern Corp.*, 63 Tenn. App. 732, 480 S.W.2d 152 (Tenn. Ct. App. 1972), the question presented to this court was whether a ten-year stock option given to a pre-organization subscriber, who later became an employee, could be exercised after the plaintiff left the employment of the company. This court held:

> We find no ambiguity in the subject stock option agreement. In its essentials it grants complainant an option for a ten-year period to purchase from the defendant company 15,000 shares of its capital stock at the price of One Dollar ($1.00) per share. . . . The option agreement is completely silent as to any restriction based upon the optionee being an officer or employee at the time of exercise. Such silence creates no ambiguity. . . .

-7-

63 Tenn. App. at 740, 480 S.W.2d at 155.  This court affirmed the trial court which had ordered the company to specifically perform by issuing the stock to Mr. McMillan.  The company had argued that although the condition of employment was not specifically written into the option agreement, it was intended to be included therein and Mr. McMillan was aware of that intent.  This court ruled that the silence on the requirement of employment created no ambiguity and that parol evidence was not admissible to show any intent contradictory to the language.  Thus, the holding in *McMillan* appears to contradict Aqua Bath's contention regarding silence on the requirement of employment.

In *Turner v. Zager*, 50 Tenn. App. 674, 363 S.W.2d 512 (Tenn. Ct. App. 1962), the parties formalized by written agreement a former oral agreement giving Mr. Turner the right to purchase from Mr. Zager, one of three shareholders and founders, ten percent of the outstanding stock of a newly formed corporation.  The agreement provided that Mr. Turner would provide satisfactory service to the corporation and for that service he would be compensated at 10% of the profits.  This compensation was to be accumulated until there were sufficient funds to purchase sixty shares of stock of the corporation held by Mr. Zager.  The agreement set a formula for the purchase price.  The agreement also provided that it could be terminated on ten days notice, and in the event of termination Mr. Turner would be compensated on the basis of 10% of the corporation's net profit.

Mr. Turner performed valuable services for the corporation until his employment was terminated twenty months after the agreement was signed.  Within the ten day notice period, Mr. Turner sought to exercise his option to purchase the sixty shares, but Mr. Zager refused to transfer the stock.

In the resulting lawsuit, Mr. Turner argued he had worked for the corporation from its inception until his employment terminated and that Mr. Zager had agreed to give him the right to buy sixty shares of stock.  Mr. Zager argued that the compensation earned under the agreement had not been sufficient to purchase the stock and, since Mr. Turner's employment had been terminated, he would not be able to accumulate enough funds to purchase the stock.

This court first discussed the enforceability of a contract arising from an exercised option, relying on several general statements of law to the effect that specific performance is available where an option (including an option to purchase shares of stock) on terms, conditions, and for a specific time constitutes an irrevocable offer which, on acceptance according to its terms, gives rise to a contract that may be specifically enforced.  50 Tenn. App. at 686-87, 363 S.W.2d at 517-18.

The court considered the argument by the defendant, Mr. Zager, that was the equivalent of an argument that the option expired upon Mr. Turner's termination from employment, stating:

> It is insisted by defendant such a provision to purchase stock from profits only is a general provision contained in profit sharing agreements as an incentive to create profits both for the employee and the investor.  And, since complainant's employment has been terminated under the terms of the agreement, he will not be able to accumulate enough funds to purchase the stock.

We cannot agree to this contention. To construe this clause of the contract as insisted by the defendant, we would have to delete the words, "until Carl B. Turner has sufficient funds," and substitute the words, "until and only when such funds are sufficient," to purchase sixty shares of stock held by Max Zager in said Corporation. Courts do not make contracts. They can only interpret and enforce them.

50 Tenn. App. at 689-90, 363 S.W.2d at 518-19.

Finally, the court found that, to the extent the agreement could be considered ambiguous, it must be construed most strongly against the drafter, Mr. Zager, and held:

We are of the further opinion to deny the complainant the relief he seeks in this case would be inequitable. He has performed his part of the contract. The contract was drawn by the defendant, himself, and under its terms no injustice will be done to him in granting the relief.

50 Tenn. App. at 691, 363 S.W.2d at 519.

In *Schwab v. Miller*, No. M2001-00932-COA-R3-CV, 2002 Tenn. App. LEXIS 301 (Tenn. Ct. App. June 7, 2002) (no Tenn. R. App. P. 11 application filed), this court considered similar issues regarding Mr. Schwab's right to a specific lot, Lot 70, in a real estate development after his employment with the developer was terminated. This court decided that issue based upon the specific language of the written agreement between the developer and what conditions that language placed upon Mr. Schwab's right to the lot.

The agreement in question was an employment agreement which was reduced to writing more than a year after employment was begun. The agreement contained a specific provision that "following termination" Mr. Schwab was not entitled to any further compensation under the agreement. The agreement had a separate paragraph on compensation, which included the statement that "Schwab shall be compensated as follows, so long as this Agreement is in force and Schwab is an employee of Company." Included in the list of items of compensation was a sub-paragraph in which the company agreed to convey Lot 70 to Mr. Schwab if various specified contingencies related to financing of the development occurred.

This court found that the only plausible construction of the agreement was that all of the contingencies relating to Mr. Schwab's right to the lot had to be satisfied while he was employed before he was entitled to the lot. In essence, we interpreted the specific contract provisions as making continued employment another contingency on the right to Lot 70.

Based on these authorities, we conclude that there is no general rule to be applied regarding when former employees may exercise stock options. Instead, it is the language and purpose of the specific agreement that govern. In other words, the parties are free to contract as they see fit. Courts defer to the contracting process by enforcing contracts according to their plain terms without

favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). Courts will decline to rewrite contracts made by the parties and will decline to relieve parties of their contractual obligations, absent an inability to contract or an unconscionable agreement. *Petty*, 197 Tenn. at 640, 277 S.W.2d at 359; *Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991).

The dispute herein arises in the interpretation of the agreement between Mr. Seraphine and Aqua Bath and specifically whether Mr. Seraphine's employment at the time the company's sales reach $6 million was a condition precedent to his ability to exercise the option and purchase the stock. In addition to the "general rule" argument discussed above, both parties make arguments based upon the language of the agreement.

Mr. Seraphine asserts that the agreement does not state that continued employment at the time $6 million in sales is reached is a condition on his exercise of the option. He asserts it was error for the trial court to imply such a condition. Mr. Seraphine also argues that the stock option was an inducement to get him to come to work for the company; its purpose was to secure his initial employment at a lower salary, not as an incentive for continued employment.

On the other side, Aqua Bath argues that Mr. Seraphine's option to purchase Aqua Bath stock was extinguished when his employment was terminated. Although Aqua Bath concedes there is no explicit language stating that Mr. Seraphine must be employed at the time he seeks to exercise his option, it argues that such a condition is implied, and must be read into the agreement, by the language of the letter offering the option as a term of employment and listing it along with salary, health insurance, and bonus. Aqua Bath asserts that, like the other terms of employment, its obligation to honor the stock option terminated upon termination of employment. Aqua Bath does not dispute that the stock option was an incentive to get Mr. Seraphine to accept employment, but argues the other terms of employment were also. Aqua Bath does not dispute that Mr. Seraphine proposed the stock option.

Based upon the authorities and principles discussed herein, we conclude that employment at the time sales reached $6 million was not a condition to Mr. Seraphine's exercise of the option for several reasons. First, and primarily, the agreement itself did not specifically make such employment a condition. Unlike the stock option plan in *Broyles* and the contract in *Schwab*, the letter agreement herein did not include any provision regarding the effect of termination of employment on the stock option. Mr. McAllister drafted the letter agreement, and his failure to include a requirement that Mr. Seraphine be employed at the time the other conditions for exercise of the option must be weighed against his interpretation of the agreement.

Secondly, we conclude that the purpose of the stock option was primarily to induce Mr. Seraphine to accept employment at the salary level offered. Unlike many employee stock option plans, and unlike the plan in *Broyles*, the letter agreement does not state the purpose of the grant of the option. While it is true that the purpose of many employee stock option plans is to encourage employees to remain employed with the company, those plans often have provisions which further

that purpose by tying the amount of options available or the right to exercise those options to specific employment longevity benchmarks. A stock option can serve a number of purposes:

> Stock options often constitute an important part of the compensation and incentive program of a corporation. They may be offered pursuant to a plan applicable to one or more executives, or they may represent part of the premium offered to attract new executives or retain the services of valued existing executives. By obtaining the right to acquire an equity interest in the corporation, whether at a discount or at market value, the executive acquires a stake in the long-term growth of the corporation, benefits from the capital appreciation of the corporation's stock, and therefore presumably will work diligently for the success of the venture.

American Bar Association Subcommittee on Executive Compensation of the Committee on Employee Benefits and Executive Compensation, *Report: Executive Compensation: A 1987 Road Map for the Corporate Advisor*, 43 Bus. Law. 187 (November 1987).

In the case before us, we conclude that the stock option was included in Mr. Seraphine's employment agreement primarily as an inducement for him to accept employment. It was offered and accepted before Mr. Seraphine began work. The option is designed to also encourage diligent efforts for the success of the company which was necessary before the option could be exercised and which would make the stock more valuable. The language of the option itself evidences that purpose. We fail to find any language indicating that Aqua Bath included the stock option for the purpose of retaining Mr. Seraphine's continued employment.

Mr. Seraphine accepted employment and worked for the company for almost three years. During the years Mr. Seraphine worked for the company its gross sales increased from $2,841,463 to almost $6,000,000. Although there is some dispute as to Mr. Seraphine's responsibility for the company's success, he performed the functions assigned to him. It appears to us that Mr. Seraphine performed under the employment agreement. His employment was not terminated due to his resignation; Aqua Bath unilaterally terminated it. Because he was an at-will employee, Aqua Bath had the right to fire him, but that decision detracts from the persuasiveness of its argument that the purpose of the stock option was to encourage him to remain in its employ.

This situation resembles that in *Turner v. Zager*, wherein Mr. Turner's employment was terminated before his accumulated compensation totaled enough to pay for the stock in his stock option, and the employer attempted to use that fact to argue that continued employment was a prerequisite to exercise of the option. This court found that to deny Mr. Turner specific performance in exercising the option would be inequitable. 50 Tenn. App. at 691, 363 S.W.2d at 519.

There are arguments to be made, and the parties have made them, regarding the equities of the different interpretations advocated by each as applied to hypothetical situations. We have reached our conclusions based upon the language of the agreement herein and the facts of this case.

We find that Mr. Seraphine's ability to exercise his option to purchase 50 shares of stock at $500 per share was not conditioned upon his continued employment at the time the sales of the company reached $6,000,000. Consequently, we disagree with the trial court's conclusion that Mr. Seraphine was not entitled to purchase Aqua Bath stock now or in the future because any potential stock option terminated at the time his employment terminated. We reverse the grant of summary judgment to Aqua Bath on this issue.

### IV. Breach and Remedy

Mr. Seraphine claimed a breach of the option agreement and sought damages for the breach. He also sought specific performance. His entitlement to either is dependent upon whether the conditions for the exercise of his option exist.

With regard to options to purchase land, and we find no reason to distinguish an option to purchase stock, it is well settled that:

> An option cannot be enforced as a contract until exercised by acceptance. The acceptance must be unqualified, absolute, positive, without reservation, and according to the terms of the option. An acceptance of an option must be such a compliance with the conditions as to bind both parties, and if it fails to do so, it binds neither.

*Pinney v. Tarpley*, 686 S.W.2d 574, 580 (Tenn. Ct. App. 1984). Whether the conditions of acceptance are met is to be determined by the language of the option contract which establishes those conditions. *Dave Williams Printing Co. v. Wooten*, 644 S.W.2d 403 (Tenn. Ct. App. 1982); *Adams v. Smith*, 500 S.W.2d 437 (Tenn. Ct. App. 1973).

Specific performance is an equitable remedy. *Miller v. Reha*, 820 S.W.2d 357, 360-61 (Tenn. 1991). It is available only when the remedy at law is inadequate. *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979); *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 554 (Tenn. Ct. App. 1998). In addition, the contract and the consequences of specific performance must be equitable and just. *Miller*, 820 S.W.2d at 360-61 (quoting *T. J. Moss Tie Co. v. Hill*, 191 Tenn. 582, 585-86, 235 S.W.2d 587, 588-89 (1951)). Specific performance will not be granted to one party unless it can also be granted to the other. *Security Land Co., Inc. v. Touliatos*, 716 S.W.2d 918, 921 (Tenn. 1986).

Specific performance is not a matter of right. A decision to grant specific performance depends heavily on the facts of each case and, therefore, lies within the sound discretion of the trial court. *T. J. Moss Tie Co.*, 191 Tenn. at 586, 235 S.W.2d at 589; *McGaugh v. Galbreath*, 996 S.W.2d 186, 191 (Tenn. Ct. App. 1998). However, a court may not grant specific performance unless the contract is clear, definite, complete, and free from any suspicion of fraud or unfairness. *Shuptrine*, 597 S.W.2d at 730; *Johnson v. Browder*, 185 Tenn. 601, 605, 207 S.W.2d 1, 3 (1947); *McGaugh*, 996 S.W.2d at 191.

The trial court determined that Mr. Seraphine had no enforceable option to purchase stock after his employment was terminated, and we have reversed that holding. Consequently, with the above stated principles in mind, we examine the assertions of each party with regard to his or its entitlement to summary judgment regarding the breach of contract and remedies for breach issues.

A.

Mr. Seraphine asks this court to direct the trial court to grant him summary judgment on the issue of liability and also to declare "that Mr. Seraphine is entitled to exercise his existing option to purchase 11% of the outstanding stock in Aqua Bath for $25,000 when sales reach $6.0 million." He also asserts that the termination of his employment was a triggering event that allowed him to exercise a pro rata portion of the option.

While we have found that Mr. Seraphine's continued employment was not a condition precedent to this exercise of the option, the sales level of $6 million clearly is. We have essentially found that the option may be exercised when that level is reached. However, the option must be exercised according to its terms. Nowhere in the language of the option is there a reference to his ability to purchase 11% of the stock. Mr. Seraphine appears to base his right to that percentage on pre-agreement discussions in which, he states, he was advised that the company had a total of 396 shares then outstanding and that Mr. McAllister "proposed that Aqua Bath give Mr. Seraphine an option to purchase a number of shares (at the time, 50 shares) that equaled an 11% ownership in the company, at $500 per share."

Clearly, the option is for fifty (50) shares, not for a percentage of shares. There is no ambiguity in that portion of the option agreement. The courts cannot read into the contract between the parties a provision that is not there. We find no basis in the unequivocal language of the option regarding the shares available to Mr. Seraphine to convert (50) fifty shares to eleven percent (11%) or to consider parol evidence regarding the parties' intent.

Mr. Seraphine also argues that the option became exercisable at least partially when he was terminated because the agreement gave him the right to a percentage of the total option if his situation with the company changed. For this argument, Mr. Seraphine relies upon that portion of the option provision in the employment letter which reads as follows:

> If the company should be sold before this sales level [$6,000,000], your stock option shall be prorated when the sales figure is above $4,000,000. As an example, if the company should be sold when the sales level is $5,000,000, you would have 50% of your option or 25 shares that you could purchase at $500 per share.

Again, Mr. Seraphine seeks to have the courts read into the agreement language which is simply not there. His argument would convert the language "if the company should be sold" to more generalized language covering any extraordinary occurrence. He argues that his termination was just

such an extraordinary occurrence that triggered his right to exercise a pro rata portion of his stock option because Aqua Bath's sales had exceeded $4,000,000 in 1998, before he was fired.

The parties to the agreement provided for one situation which would trigger Mr. Seraphine's right to exercise the stock option before the company sales reached $6 million. They could have provided for other situations but did not. We find no basis in the clear language of the provision to add another and different condition and no basis in the unambiguous language to consider parol evidence on what Mr. Seraphine thought it meant or what he intended.

The company was not sold. Therefore, the triggering event agreed to by the parties to accelerate Mr. Seraphine's right to exercise the option has not occurred. He did not have an enforceable right to purchase a pro rata portion of the option stock upon his termination. We find that Aqua Bath is entitled to summary judgment on Mr. Seraphine's claim that, upon termination, he had a right to purchase a pro rata portion of the 50 shares of option stock.

We also find that Mr. Seraphine has an option to purchase 50 shares of stock that can be exercised when Aqua Bath's sales level reaches $6 million.

B.

Aqua Bath submitted an affidavit of the company's Chairman that the company "did not attain $6,000,000 in either 'gross sales' or 'net sales' for the fiscal year ending April 30, 1999, or in any prior or subsequent fiscal year. Aqua Bath has not reached $6,000,000 or more in either 'gross sales' or 'net sales' for any consecutive 12 month period since its incorporation." Mr. Seraphine responded to this statement of fact by saying it was undisputed, "except that Plaintiff asserts that Aqua Bath should have reached a sales level of $6 million."

This undisputed statement of fact essentially establishes that the condition precedent to Mr. Seraphine's exercise of his stock option had not occurred at the time he sought specific performance and damages for breach.

The parties dispute the meaning of some of the terms in the option agreement's simple statement that the option is "to be exercised when the sales level reaches $6,000,000." Mr. Seraphine contends that the $6 million sales level referred to gross sales, and Aqua Bath contends it refers to net sales. Aqua Bath contends that the $6 million sales level must have been met during a single fiscal year, May through April; Mr. Seraphine contends that the level must have been met for any consecutive twelve month period. The parties have provided factual allegations in support of these positions. Aqua Bath asserts that summary judgment for Mr. Seraphine would be inappropriate because the parties dispute the meaning of the terms which establish the basic condition for his exercise of the stock option.

We agree that summary judgment for Mr. Seraphine is not appropriate because, according to the record before us, it is undisputed that Aqua Bath's sales had not reached the $6 million level

even under Mr. Seraphine's interpretations. Consequently, Mr. Seraphine has failed to establish that Aqua Bath has breached the option agreement because he has failed to establish his right to exercise the option. Absent a breach, Mr. Seraphine is not entitled to either damages or specific performance.

Because we have determined that he is entitled to exercise his option when the sales level reaches $6 million, upon remand, the parties should be allowed to present additional evidence regarding whether the conditions for the exercise of his option have been met.

## V.  Breach of Duty of Good Faith

Mr. Seraphine's complaint included a claim that Aqua Bath breached its duty of good faith implied in the option agreement because it terminated his employment in an attempt to prevent him from meeting the conditions requisite to his exercise of that option. Aqua Bath argues that no duty of good faith and fair dealing can be implied into an at-will employment arrangement in the absence of express provisions in an employee handbook. Aqua Bath further argues that it never promised that Mr. Seraphine's employment would not be terminated and never promised that his stock option would survive his termination. Aqua Bath essentially relies upon well-settled law regarding an employer's right to terminate the employment of an at-will employee at any time for good cause, bad cause, or no cause at all. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569 (Tenn. 1999).

The trial court granted Aqua Bath summary judgment on this issue holding that, as a matter of law, because Mr. Seraphine's employment was at-will, Aqua Bath owed him no duty of good faith and fair dealing.

Mr. Seraphine, however, does not contest the validity of his termination or allege that he was wrongfully terminated, recognizing that only a very few statute or public policy based exceptions have been found to justify judicial interference in an at-will employment situation.

Instead, Mr. Seraphine argues that a duty of good faith and fair dealing was necessarily implied in the option agreement itself, as it is in all contracts in Tennessee. He further argues that Aqua Bath terminated his employment at a time when the company's sales level was close to the $6 million level for the purpose of depriving him of the opportunity to exercise that option.

Because we have determined that the termination of Mr. Seraphine's employment did not deprive him of his right to exercise his stock option, and because the sales level condition had not been reached, Mr. Seraphine has failed to demonstrate that he was injured in the exercise of his option by the company's actions. Actual injury is a requirement for establishing a cause of action.

## VI.  Inducement of Breach Claims Against Individual Defendants

Mr. Seraphine also claimed that the two individual defendants, Mr. McAllister and Mr. Dorris, intentionally and maliciously induced Aqua Bath to terminate Mr. Seraphine's employment and to refuse to transfer the stock when he attempted to exercise the stock option. He equates these

allegations to a claim for inducement to breach, including intentional interference with an at-will employment contract and with the stock option agreement. On this claim, the trial court held that Mr. Dorris and Mr. McAllister did not unlawfully induce a breach of contract in violation of common law or statute.

Tennessee recognizes both a common law action and a statutory action for unlawful inducement of a breach of contract, but the elements of both are the same. *Polk and Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1990).

> In order to recover for procurement of a breach of contract the plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that he maliciously intended to induce a breach, and there must have been a breach, proximately caused by his acts, resulting in damages.

*Id*. 783 S.W.2d at 543.

Generally, only third parties to the employment relationship may be liable for wrongful interference with at-will employment. *Forrester v. Stockstill*, 869 S.W.2d 328, 331 (Tenn. 1994). Thus, a corporate director, officer, or employee is not liable for tortiously interfering with a contract, including an at-will employment contract, if he or she is acting to serve the corporate interests, but may be liable if acting outside the scope of his or her authority, with malice, or to serve personal interests. *Id*. 869 S.W.2d at 333. "[W]hen an officer, director or employee of a corporation acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation, in claims of intentional interference with employment, the action of the officer, director, or employee is considered to be the action of the corporation and is entitled to the same immunity from liability." *Id*. 869 S.W.2d at 328.

Both parties herein have argued the sufficiency, for summary judgment purposes, of their factual allegations regarding the motive, intent, personal interest, and malice, or lack thereof, of Mr. McAllister and Mr. Dorris. Mr. Seraphine asserts that his evidence has created genuine issues of material fact regarding whether the two individual defendants acted in their personal interests as shareholders and not in the company's best interests "in firing Mr. Seraphine." Aqua Bath asserts that Mr. Seraphine has not presented evidence to overcome its proof that the corporate officers acted within the scope of their authority and in the corporation's best interest because of Mr. Seraphine's performance in the months preceding his termination.

We need not reach these issues. A claim for intentional interference requires a showing of breach and injury resulting from the breach. As we have previously found, Mr. Seraphine has not proved a breach of the option agreement because the $6 million sales level condition had not been reached. Without the present right to exercise his stock option, he has shown no injury resulting from the company's refusal to transfer stock to him. His claim is that he was fired in an attempt to defeat his right to exercise his option. He does not seek damages for the loss of compensation due

-16-

to his loss of employment. The harm he alleges is deprivation of his stock option. We have determined that the termination of his employment did not result in the expiration of that option.

Because Mr. Seraphine has shown neither breach of the option agreement nor injury to his right to exercise that option, we affirm the trial court's grant of summary judgment to the individual defendants.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's grant of summary judgment to the Aqua Bath defendants on the breach of duty of good faith and intentional interference claims, but reverse the trial court's grant of summary judgment to Aqua Bath on the breach of contract claim. We hold that Mr. Seraphine has a stock option which survived the termination of his employment and which may be exercised when Aqua Bath's sales level reaches $6 million. We find, however, that Mr. Seraphine has not demonstrated a breach of the stock option agreement or the right to any remedy based on the stock option agreement, and, therefore, is not entitled to summary judgment on that issue. Costs of the appeal are taxed one-half to Mr. Seraphine and one-half to the Appellees.

_____
PATRICIA J. COTTRELL, JUDGE