# IN THE COURT OF APPEALS OF TENNESSEE
## AT  KNOXVILLE
Assigned on Briefs December 10, 2014

## JAMES McMILLIN ET AL. v. PAUL LINDSEY McMILLIN ET AL.

### Appeal from the Chancery Court for Knox County
### No. 184965-2      Daryl R. Fansler, Chancellor

---

### No. E2014-00497-COA-R3-CV-FILED-MARCH 31, 2015

---

The plaintiffs are siblings and two of the four adult children of the decedent.  The defendants include a third adult child and his wife.  In the months preceding her death, the decedent changed her bank accounts, originally titled solely in her name, to become joint accounts with the defendant son with right of survivorship.  The plaintiffs asserted that the defendant sibling exerted undue influence over the decedent in these transactions. They sought the return of all monies withdrawn from those bank accounts to the decedent's estate.  Following a two-day trial, the jury rendered a verdict for the plaintiffs in the amount of $284,800.  The defendants have appealed.  Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Paul L. McMillin, Knoxville, Tennessee, Pro Se.

Johneta McMillin, Knoxville, Tennessee, Pro Se.

Bruce Hill, Sevierville, Tennessee, for the appellees, James McMillin and Iris Davenport.

**OPINION**

## I. Factual and Procedural Background

This case involves the issue of whether the eighty-two-year-old decedent, Dorothy Jean McMillin ("Decedent"), was acting under the undue influence of her adult son, Paul McMillin, when she made him joint owner of her bank accounts in the months preceding her death in November 2012. Decedent was the mother of three other adult children: James McMillin, Iris Davenport, and Linda Cole.[1] In the spring of 2012, Decedent was living alone in her home when Paul[2] came to visit and discovered her lying on the floor, unconscious and unresponsive. Decedent was diabetic and suffered from Chronic Obstructive Pulmonary Disease, congestive heart failure, and numerous other physical maladies. She was known to be reclusive and seldom left her home or allowed visitors inside. Upon Paul's discovery of Decedent's unresponsive condition, she was immediately taken to the hospital by ambulance, where her blood sugar level was determined to be dangerously high.

Following her release from the hospital, Decedent convalesced in a rehabilitation center for a few weeks while regaining her strength. During Decedent's absence from her home, Paul and his wife, Johneta, assisted by Paul's sister, Ms. Davenport, cleaned Decedent's home and replaced the carpet therein, having discovered the home to be in a serious state of disorder. Decedent was able to return to her home, albeit with assistance, for a period of time. Paul helped care for Decedent, transporting her wherever needed. According to Paul, Decedent's mental state was good, affording Decedent complete control of her personal affairs and finances. As explained, he complied with Decedent's directions to take her on various errands, including trips to the bank so that she could withdraw money on occasion.

In early June 2012, Decedent asked Paul to transport her to the office of her attorney, Robert Wilkinson. Upon doing so, Paul learned that Decedent wished to change her last will and testament to name Paul to be her personal representative. Her prior will designated James to serve in such capacity. Regarding the distribution of her estate, Decedent expressed a desire that her children share equally. Decedent also directed Mr. Wilkinson to change her power of attorney so as to designate Paul as her attorney-in-fact, rather than James. Mr. Wilkinson drafted Decedent's will and power of attorney according to her expressed desire, facilitating Decedent's execution of these documents on June 26, 2012.

---

[1] Ms. Cole is not a party to this action.

[2] Although this Court generally refers to parties and witnesses by respective surnames, for ease of reference we have chosen at times to use first names in referring to siblings James and Paul McMillin.

At approximately the same time, Decedent asked Paul to transport her to two banks wherein she maintained accounts solely in her name. While at the financial institutions, Decedent changed those accounts to be titled jointly with Paul with right of survivorship. According to Paul, Decedent also indicated that she wished to build a new home on the six-acre tract of real property that contained her existing home. As plans were selected and purchased, construction began on the new home, with Paul acting as general contractor. Soon Paul withdrew large sums of money from the joint bank accounts, claiming the funds were utilized for the construction of Decedent's new home.

Decedent eventually fell ill again and required another hospital visit, followed by an additional stay in the rehabilitation center. Upon her release, Decedent moved in with Paul and Ms. McMillin. Although construction on her new home continued, Decedent unfortunately did not live to see the home completed. She passed away on November 18, 2012. Following Decedent's passing, Paul continued to withdraw money from the joint bank accounts as construction of the home proceeded. He also presented to the court Decedent's will for probate and was granted letters testamentary. As personal representative, Paul distributed approximately $170,000 to himself and $170,000 to each of his three siblings from Decedent's estate, in accordance with the provisions of the will.

On March 28, 2013, siblings James and Ms. Davenport (collectively "Plaintiffs") filed the instant action against Paul and Ms. McMillin (collectively "Defendants"). Plaintiffs asserted that Paul had a confidential relationship with Decedent and exercised undue influence over her. According to Plaintiffs, Decedent suffered from dementia and other serious illnesses during the months before her death, making her susceptible to such influence. Plaintiffs claimed that Paul had convinced Decedent to change the ownership of her bank accounts, making them jointly owned with Paul with right of survivorship. As Paul had withdrawn the money from these accounts and placed the funds in his joint account with Ms. McMillin, Plaintiffs also asserted that a constructive trust should be placed on those funds and that all of the funds should ultimately be reimbursed to Decedent's estate.

A jury trial was conducted on February 25 and 26, 2014. Defendants appeared and participated as self-represented during the trial. Multiple witnesses testified, including, *inter alia*, all four siblings, Mr. Wilkinson, bank representatives, and two of Decedent's doctors. Following deliberations, the jury returned a verdict in favor the Plaintiffs in the amount of $284,800. Defendants filed separate motions for new trial, which the trial court denied. As the court determined that there existed more than sufficient evidence to support the jury's verdict, it affirmed the verdict as thirteenth juror. Defendants timely filed notices of appeal.[3]

---

[3]Plaintiffs filed a motion seeking dismissal of this appeal and an award of attorney's fees, asserting that the appeal was frivolous because it sought to appeal an order entered in a separate Knox County Chancery

## II. Issues Presented

Paul McMillin raises the following issues for our review, which we have restated slightly:

1. Whether the jury erred in finding that a confidential relationship existed between Paul McMillin and Decedent whereby he exercised undue influence over her.

2. Whether Paul McMillin received a benefit by removing funds from a jointly held financial account.

Ms. McMillin raises the following additional issues, which we have also restated:

3. Whether the trial court erred in failing to charge the jury regarding certain banking laws applicable to joint financial accounts.

4. Whether the jury properly applied the evidence regarding joint bank accounts in rendering its verdict.

5. Whether the trial court erred in allowing expert witness Dr. Oliveira to testify over the objection of Defendants.

6. Whether Ms. McMillin's due process rights were violated during jury selection and other stages of trial.

7. Whether the trial court should have considered Ms. McMillin's liability at some point prior to the post-trial motion hearing.

## III. Standard of Review

As our Supreme Court has explained:

Rule 13(d) of the Tennessee Rules of Appellate Procedure provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." As this Court stated in the

---

Court case wherein Paul was removed as personal representative of Decedent's estate. This motion was deferred to the appellate panel for determination. We have reviewed this motion and find it to be without merit; accordingly, the motion is denied.

4

recent case of *Hodges v. S.C. Toof & Co.,* "It is well established that when reviewing a judgment based on a jury verdict, appellate courts are limited to determining whether there is material evidence to support the verdict." 833 S.W.2d at 898.

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co. v. C. & R. Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

*Forrester v. Stockstill*, 869 S.W.2d 328, 329-30 (Tenn. 1994).

Regarding the *pro se* status of Defendants, we note that:

> Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary. Thus, the courts must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

> The courts give pro se litigants who are untrained in the law a certain amount of leeway in drafting their pleadings and briefs. Accordingly, we measure the papers prepared by pro se litigants using standards that are less stringent than those applied to papers prepared by lawyers.

> Pro se litigants should not be permitted to shift the burden of the

litigation to the courts or to their adversaries. They are, however, entitled to at least the same liberality of construction of their pleadings that Tenn. R. Civ. P. 7, 8.05, and 8.06 provide to other litigants. Even though the courts cannot create claims or defenses for pro se litigants where none exist, they should give effect to the substance, rather than the form or terminology, of a pro se litigant's papers.

*Hessmer v. Hessmer*, 138 S.W.3d 901, 903-04 (Tenn. Ct. App. 2003) (internal citations omitted).

### IV. Confidential Relationship and Undue Influence

Paul McMillin asserts that the jury erred in finding that a confidential relationship existed between Decedent and himself whereby he exercised undue influence over his mother. The issue of whether such a confidential relationship existed is a question of fact. *See In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008). This Court has previously elucidated:

> Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). In general terms, it is any relationship that gives one person the ability to exercise dominion and control over another. *Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 410 (Tenn. 2002); *Childress v. Currie*, 74 S.W.3d at 328; *Mitchell v. Smith*, 779 S.W.2d at 389. It is not merely a relationship of mutual trust and confidence, but rather it is one
>
>> where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.
>
> *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).
>
> Fiduciary relationships are confidential per se because of the legal status of the parties. They automatically give rise to a presumption of undue influence with regard to transactions that benefit the fiduciary. Examples of such fiduciary relationships include that between guardian and ward, attorney and client, or conservator and incompetent. *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith*, 779 S.W.2d at 389;

6

*Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978). Relationships not fiduciary in nature, even those that are inherently confidential, such as those between family members, are not confidential per se and require proof of the elements of dominion and control in order to establish the existence of a confidential relationship. *Matlock v. Simpson*, 902 S.W.2d at 385-86; *Kelly v. Allen*, 558 S.W.2d at 848.

Accordingly, evidence that two persons are members of the same family, without more, lends no support to an undue influence claim. Proof that one family member exercised dominion and control over another establishes the existence of a confidential relationship but does not make out a prima facie claim of undue influence. In addition to proving the existence of a confidential relationship between two family members, a will's contestant must establish at least one other suspicious circumstance, such as a transaction benefitting the dominant party in the confidential relationship.

*Kelley v. Johns*, 96 S.W.3d 189, 197-98 (Tenn. Ct. App. 2002).

Paul argues that there was no evidence of the existence of a relationship that was confidential per se because there was no proof that he in fact exercised the authority granted to him by the power of attorney. We agree. Our Supreme Court has explained that "[w]hen an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney." *See Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002). At trial, no evidence was introduced to establish that Paul ever acted as Decedent's attorney-in-fact.

As previously stated, relationships that are not fiduciary in nature "require proof of the elements of dominion and control in order to establish the existence of a confidential relationship." *See Kelley*, 96 S.W.3d at 198. Paul contends that there was no such proof in this case because Decedent was shown to be independent, private, and autonomous in her decision-making. The burden of proof regarding a confidential relationship rests upon the parties claiming the existence of such a relationship, which in this case would be Plaintiffs. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). As this Court has explained:

A confidential relationship in this context is not merely a relationship of mutual trust and confidence, but rather a relationship in which confidence is placed in one who is the dominant personality in the relationship, with the ability, because of that confidence, to exercise dominion and control over

7

the weaker or dominated party. *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973).

> [T]here must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.

*Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977) (emphasis added). Evidence of one party's deteriorated mental or physical condition will substantiate the existence of a confidential relationship if the condition renders the weaker party unable to guard against the dominant party's imposition or undue influence. *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988). Still, "[t]he core definition of a confidential relationship requires proof of dominion and control," and the question of whether undue influence existed should be decided by the application of sound principles and good sense to the facts of each case. *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002). In undue influence cases, the question for us "is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time." *Williamson v. Upchurch*, 768 S.W.2d at 270. Instead, we must determine "whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party." *Id.*

*In re Estate of Reynolds*, No. W2006-01076-COA-R3-CV, 2007 WL 2597623 at *8 (Tenn. Ct. App. Sept. 11, 2007).

Pursuant to the applicable standard of review, in determining whether there is material evidence to support the verdict that a confidential relationship existed between Paul and Decedent, this Court is "required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary." *See Forrester*, 869 S.W.2d at 329-30. "Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed . . . ." *Id.*

In the case at bar, there was evidence that Decedent suffered some degree of mental confusion in the months before her death. Paul, James, and Ms. Davenport all testified that Decedent was unable to care for herself or properly take her medications as

prescribed. Ms. Davenport acknowledged at trial that the siblings should have sought a conservatorship for Decedent, although she did not believe they could agree to do anything in concert. Barbara Pullen, Decedent's neighbor and friend, who spoke to Decedent two to three times per week, testified that Decedent became agitated and mentally confused during the months before her death. Another neighbor, Erma Jean Hardin, whose friendship with Decedent spanned forty years, claimed to speak and visit with Decedent frequently. As Ms. Hardin explained, Decedent should have been relocated to a nursing home for Decedent's well-being. According to Ms. Hardin, Decedent suffered a level of confusion and was unable to care for herself or properly take her medication. Ms. Hardin further stated that Decedent was unhappy that Paul was building her a new home because she instead wished to live in her existing home. Ms. Hardin related that Decedent complained that Paul was attempting to tell Decedent what to do.

Dr. Odacir Oliveira, a clinical psychologist with a specialty in neuropsychology and geriatrics, testified that despite never meeting Decedent, he had examined an MRI conducted on Decedent's brain in 2012. Dr. Oliveira opined that Decedent's MRI reflected brain atrophy, which would affect the Decedent's ability to make decisions. According to Dr. Oliveira, persons with conditions similar to Decedent could be vulnerable to influence by someone expressing a willingness to serve as caregiver. Most significantly, Paul admitted that he considered Decedent as being susceptible to manipulation as early as 1998. Ergo, taking the strongest legitimate view of all the evidence in favor of the jury's verdict, allowing all reasonable inferences to sustain the verdict, and discarding all evidence to the contrary, we determine that there was clearly material evidence to support the jury's finding that a confidential relationship existed.

Where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *See Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving the fairness of the transaction by clear and convincing evidence. *Id.* at 386. Paul asserts that in this case, there is no proof that he received a benefit from Decedent because he removed funds from financial accounts in which he was joint owner with Decedent and placed such monies into an account in which he was joint owner with his wife. According to Paul, because he had an ownership interest in both accounts, he received no benefit by the transfer of these funds. We disagree.

The issue is not whether Paul received a benefit when he withdrew funds from the accounts he held jointly with Decedent and deposited the funds into other accounts. The

issue is whether Paul received a benefit when Decedent established him as joint owner with right of survivorship in accounts she previously maintained in her sole name. There can be no question that he did receive a benefit by virtue of these transactions. *See Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002) (holding that an adult child received a benefit from being named joint tenant with right of survivorship on his mother's bank account). The evidence demonstrated that when Paul was named joint owner of these accounts, he was afforded unfettered access to over $615,000 in funds. Paul admitted that he received some $615,000 from these accounts both before and after Decedent's death, which he withdrew by virtue of his status as a joint account holder. Before Decedent added his name to these accounts, Paul possessed no ability to access these funds and held no legal interest therein. Thus, Paul clearly received a benefit by being named a joint owner of these funds initially belonging to Decedent.

Having found the existence of a confidential relationship coupled with transactions whereby Paul received a benefit from Decedent, the presumption of undue influence arose. *See Matlock*, 902 S.W.2d at 386. Accordingly, Paul was required to show the fairness of the transactions by clear and convincing evidence. *Id*. He could not do so in this case, however, as Decedent's will evinced a clear and unambiguous intent by her that her children share equally in her estate. Paul did not dispute that this was Decedent's intent. He further presented no evidence to support the fairness of the transactions in question.

Paul attempted to demonstrate that all sums he withdrew from Decedent's accounts were used to construct her new house. He admitted, however, that while he had received funds from these accounts totaling $615,000, he had only expended approximately $370,000 in the construction of the house. Paul later attempted to recant this testimony, although he provided no proof to the contrary. Plaintiffs, however, presented evidence in the form of cancelled checks, bank statements, and withdrawal slips to substantiate their claims regarding the amount of funds withdrawn. Conversely, Paul presented no substantiation of his claim that he spent $370,000 on building Decedent's home. Further, Paul admitted that the house had been appraised at a value of approximately $320,000. He provided no explanation for the disposition of the balance of the $615,000, except to state that he withdrew cash for Decedent's use in paying her bills at her direction. The jury's verdict of $284,800 reflects the approximate difference between the $615,000 removed from Decedent's accounts and the appraised value of the new home. Upon our careful review of the record, we conclude that there is material evidence to support the jury's verdict both in substance and amount, and the verdict must be affirmed. *See Forrester*, 869 S.W.2d at 329-30.

## V. Issues Presented by Ms. McMillin

Turning now to the issues raised by Ms. McMillin, we note initially that certain issues presented cannot be considered on appeal because they were not raised in her motion for new trial. Tennessee Rule of Appellate Procedure 3(e) provides in relevant part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

As our Supreme Court has elucidated:

> In *Mason v. Tenn. Farmers Mut. Ins. Co.*, 640 S.W.2d 561 (Tenn. Ct. App. 1982), our Court of Appeals specifically addressed the failure of a party to challenge the propriety of a jury instruction and concluded that Rule 3(e) of the Tennessee Rules of Appellate Procedure barred consideration of the issue on appeal:
>
>> [T]he reason therefor is to allow the trial court to rectify any errors that might have been made at trial and to avoid "appeal by ambush." The rule is not new in this jurisdiction, having been the law prior to the adoption of the existing rules of appellate procedure.
>
> *Id.* at 563 (citation omitted). The comments to Rule 3 support that conclusion and make reference to Rule 36(a) for the proposition that "relief need not be granted to a party who fails to take whatever action is reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 3(e), Advisory Comm'n Comments. The Advisory Commission Comments to Rule 36(a) provide that "[t]he last sentence of this rule is a statement of the accepted principle that a party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a), Advisory Comm'n Comments. Generally, a party to a lawsuit cannot complain of an error if he created the situation. *Waterhouse v. Perry*, 195 Tenn. 458, 260 S.W.2d 176, 178 (Tenn. 1953). Typically, an

issue not brought to the trial court's attention in the motion for new trial cannot be raised on appeal unless it amounts to plain error "'seriously affect[ing] the fairness, integrity, or public reputation of judicial proceedings.'" *Manning v. State*, 500 S.W.2d 913, 914 (Tenn. 1973) (quoting *Silber v. United States*, 370 U.S. 717, 718, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962)). There has been no specific allegation of plain error in this instance and no argument addressing the factors permitting its application.

*Waters v. Coker*, 229 S.W.3d 682, 689-90 (Tenn. 2007).

In her brief, Ms. McMillin raises several issues regarding, *inter alia*, jury instructions, juror questionnaires, the admission of expert testimony, and the conduct of the trial proceedings. Ms. McMillin did not, however, raise these issues in her motion for new trial. Due to this omission, this Court cannot consider these issues on appeal. *See* Tenn. R. App. P. 3; *see also Fahey v. Eldridge*, 46 S.W.3d 138, 142 (Tenn. 2001). Further, Ms. McMillin's issue regarding the propriety of the jury's verdict has been fully addressed above.

Ms. McMillin also did not make any allegations of plain error. As this Court has previously explained:

> Under Rule 103(d) of the Tennessee Rules of Evidence and Rule 36(b) of the Tennessee Rules of Appellate Procedure, this Court may "take notice of 'plain errors' that were not raised in the proceedings below." Any consideration of a "plain error" lies within the discretion of the appellate court. Moreover, Rules 13(b) and 36(a) of the Tennessee Rules of Appellate Procedure give the appellate court the discretion to consider issues that have not been properly presented, in order to achieve fairness and justice.

*Pearson v. Ross*, No. W2011-00321-COA-R3-CV, 2011 WL 6916194 at *5 (Tenn. Ct. App. Dec. 28, 2011) (internal citations omitted). Plain error has been defined as error "of such a great magnitude that it probably changed the outcome of the trial." *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). Even had Ms. McMillin specifically alleged plain error herein, our thorough review of the record has revealed no such error.

## VI. Jury Selection Issue

Ms. McMillin also presents an issue regarding whether her due process rights were violated when the trial court engaged in a sidebar discussion with counsel for Plaintiffs

and Paul concerning a juror without inviting Ms. McMillin to participate. As this issue was raised in Ms. McMillin's motion for new trial and specifically addressed by the trial court, we will consider the matter on appeal.

As the trial court noted during the post-trial motion hearing, the transcript reflects that counsel for Plaintiffs, Ms. McMillin, and Paul had all passed their jury ballots to the court when a question was raised regarding one of the jurors. When the court directed Paul and Plaintiffs' counsel to approach the bench, Ms. McMillin did not approach. A sidebar discussion followed, resulting in the juror being asked whether she was employed at Home Depot or Summit Medical. The juror responded that she did not work at Home Depot but that she did work at Summit Medical. As the matter was not further addressed, the jurors were empaneled.

Ms. McMillin now argues that as the respective juror works at her physician's office, Summit Medical, such circumstance places the juror's impartiality in question. As the trial court noted, Ms. McMillin did not ask any questions of this juror. She likewise did not raise any issue relative to the juror's employment as the jury had already been accepted by Ms. McMillin at that point. While the trial court specifically inquired of Ms. McMillin if she wished to question the jurors, she chose not to do so. Ms. McMillin has not shown any alleged misconduct by the juror, the court, or opposing counsel, and she has demonstrated no violation of her due process rights. We find this issue to be without merit.

## VII. Conclusion

For the reasons stated above, we affirm the judgment of the trial court. Costs on appeal are assessed equally to the appellants, Paul and Johneta McMillin. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

13