IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2018 Session

**IN RE THE ESTATE OF LOUISE J. ASLINGER**

**Appeal from the Circuit Court for Knox County**
**No. 2-62-16     William T. Ailor, Judge**

_____

**No. E2017-01371-COA-R3-CV**
_____

This action involves a will contest in which the decedent's daughter alleged that the current will was void due to either undue influence or lack of mental capacity. The case proceeded to a jury trial, after which the jury invalidated the will. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J. AND RICHARD H. DINKINS, J., joined.

Jewell O. Presnell and Betty J. Ferguson, Knoxville, Tennessee, Pro Se.

Edward L. Summers, Knoxville, Tennessee, for the appellee, Sharon E. Foust.

**OPINION**

**I.     BACKGROUND**

Louise Aslinger ("Decedent") died on February 3, 2015, at the age of 84. She was survived by one daughter, Sharon Foust ("Daughter"), age 62. Decedent was self-sufficient and lived alone until she fell and sustained injuries in April 2014. She was admitted to NHC Nursing Home ("NHC") to aid her in her recovery efforts before returning home. Upon returning home, she sustained more injuries and suffered a stroke a few days later in June 2014. Decedent returned to NHC for further care. At that time, Daughter attempted to secure a power of attorney to act on her behalf. Unbeknownst to her, Jewell Pressnell, who served previously as a caretaker, had obtained a health care power of attorney and a durable power of attorney on July 8.

Decedent was transferred to Elmcroft Assisted Living ("Elmcroft") on July 23. While at Elmcroft, Decedent refused to submit to tube feeding, thereby leading doctors to advise Ms. Pressnell that the prognosis was grim. Thereafter, Ms. Pressnell secured another durable power of attorney on August 1. She also arranged for the execution of a new will with the help of an attorney, Mr. Bell. Prior to drafting the will, Mr. Bell and his wife, Dorotha Bell, interviewed Decedent in Ms. Pressnell's presence on August 8. Four to five hours following the interview, Decedent was rushed by ambulance from Elmcroft to the emergency room at Tennova Healthcare Physicians Regional Medical Center ("Tennova").

The next day, Mrs. Bell secured two witnesses and met Ms. Pressnell and Decedent in Decedent's hospital room, where she signed the will. The will, dated August 9, named Ms. Pressnell as a co-executor and included her and her daughter, Betty Ferguson, as beneficiaries. Daughter was also included in the will, to a lesser extent. This will presumably invalidated a prior will, dated September 22, 2005, in which Decedent named Daughter as executrix and devised her "real property" to Daughter.[1]

Meanwhile, Daughter reported her suspicions of elder abuse to the Knox County Sheriff's Office on August 5. Detective Jeremy McCord was assigned to the case and ultimately found the complaint unfounded. However, Decedent advised him that Daughter had slapped her twice. On the basis of Decedent's claim of physical abuse, Detective McCord advised Daughter not to contact Decedent.

Decedent was discharged from Tennova on August 14, and readmitted to NHC. On October 4, Decedent was taken by Ms. Pressnell to live with Mrs. Ferguson, who charged Decedent $100 per day to live in her residence. Decedent remained there until her death on February 3, 2015. Thereafter, Daughter filed this action to contest the will, naming Ms. Pressnell and Mrs. Ferguson (collectively "Representatives") as parties and claiming that the will was void as a result of undue influence and Decedent's lack of the requisite mental capacity.

The case proceeded to a jury trial, at which several witnesses testified. Connie Cabage and Ruth Heiser testified that Mrs. Bell asked for their assistance in witnessing the signing of a will on August 9. They accompanied Mrs. Bell to Tennova between 11:30 a.m. and 12:00 p.m. and witnessed Decedent's act of signing the will. They claimed that Decedent was aware that she was signing her will and that they did not witness any behavior that would lead them to believe that Decedent was incompetent. Ms. Heiser confirmed that Ms. Pressnell was present in the room during that time.

---

[1] A specific bequest of personal property was not included.

Mrs. Bell testified that Mr. Bell, her husband who is now deceased, practiced law for approximately 53 years prior to his passing.  She recalled that Ms. Pressnell contacted her in August 2014 while she and Mr. Bell were vacationing in Nashville.  Ms. Pressnell requested assistance in drafting a will, and Mrs. Bell advised her that they would contact her upon their return.  Ms. Pressnell contacted them again prior to their return and following their return.  Ms. Pressnell advised her that she held a power of attorney for Decedent and that Decedent sought to leave her belongings to Pressnell.

Mrs. Bell stated that she and Mr. Bell met with Ms. Pressnell and Decedent at Elmcroft on August 8, 2014, around 3:30 p.m.  She recalled taking notes during the meeting and also taping the interaction to aid Mr. Bell in his representation because he was visually handicapped and had difficulty hearing.  A portion of the recording was played for the jury in which Decedent identified herself and provided her address, age, and date of birth, among other information.  Upon questioning, Decedent claimed that her house was worth approximately $110,000.  The following colloquy then occurred:

Mr. Bell:       About $110,000, all right.  Let me ask you this:  Who do you want to have the most of your property?

[Decedent]:   Jewell.

Mr. Bell:       Jewell?  Jewell, that's your sitter and your caretaker?

[Decedent]:   Uh-huh.

Mr. Bell:       Right?

[Decedent]:   Uh-huh.

Mr. Bell:       And you want her - - do you want her to have the real estate and the personal - -

[Decedent]:   I want her and her daughter to have 50 percent.

Mrs. Bell:      She wants Jewell's daughter to have 50 percent.

[Decedent]:   Jewell's daughter.

Mr. Bell:       You want Jewell to have 50 percent.

[Decedent]:   Uh-huh.

Mr. Bell:      And you want Jewell's daughter to have 50 percent?

[Decedent]:   Uh-huh.

Mr. Bell:      Is that correct?

[Decedent]:   Uh-huh.

Mr. Bell:      All right.  That includes all of your property?

[Decedent]:   Uh-huh.

Mr. Bell:      The house, lot, and all your personal property which is cars, money in banks, stocks and bonds, you want all that to go to Jewell and her daughter?

[Decedent]:   Uh-huh.

Mr. Bell:      At 50-50?

[Decedent]:   Yes.

Mr. Bell:      Is that correct?

[Decedent]:   Uh-huh.

Mr. Bell:      All right.  Now, let me ask you this: Why do you not want to give - - it's none of my business, you don't have to give anybody anything you don't want to.  Why do you not want your daughter to have anything?

Decedent then claimed that Daughter "gave [her] a lot of problems" and slapped her and slammed her down.  Mr. Bell continued,

Mr. Bell:      When?  Has that occurred more than one time?

[Decedent]:   No.

Mr. Bell:      Just one time?

[Decedent]:   Uh-huh.

Mr. Bell:       Is that - - was it a recent time?

[Decedent]:   Huh?

Mr. Bell:       Has that been within the last year?

[Decedent]:   For years.

Mr. Bell:       But it's happened just one time[?]

[Decedent]:   Twice.

Mr. Bell:       Twice in the last year?

[Decedent]:   Uh-huh.

Mr. Bell:       She knocked you down and slapped you?

[Decedent]:   Uh-huh.

Mr. Bell:       And so, therefore, you don't want to leave her anything?

[Decedent]:   (Inaudible.).

Mr. Bell:       Right?  Is that a yes or no?

[Decedent]:   Should I leave her the house?

Mr. Bell:       Well, I don't know.  If you don't want to leave her anything, that house is valuable, why don't you leave her $5,000, you know, or something like that, depending on what you want.  It's up to you.  But if she's been mean to you and you don't want to leave her much, you don't have to, under the law, you don't have to.  Do you understand?  Do you understand what I'm telling you?  I don't think you do.  What I'm saying to you, listen to me carefully, is that if you don't want to leave your daughter anything, you do not have to.  Do you understand that?

Mrs. Bell:      You have to talk.  You can't - - you have to say yes or no or –

[Decedent]:   Yes.

- 5 -

Mr. Bell:     You understand that?

[Decedent]:   Yes.

Mr. Bell:     Okay.  But you think you want to leave - - you think you might want to leave her, your daughter, something, though; is that right?

[Decedent]:   Uh-huh.

Mr. Bell:     Yes?

[Decedent]:   Yes.

Mr. Bell then questioned Decedent concerning her bank accounts.  Decedent stated that she held checking accounts at First Tennessee Bank, SunTrust, and Regions Bank.  However, she denied ownership of any savings accounts, stocks or bonds, and securities.  Mr. Bell continued,

Mr. Bell:     Is that all of the cash, all the money that you have, dear?

[Decedent]:   Uh-huh.

Mr. Bell:     And you want Jewell and her daughter to have that?

[Decedent]:   Uh-huh.

Mr. Bell:     Right?

[Decedent]:   Uh-huh.

Mrs. Bell:    Do you know how much you have in the bank?

[Decedent]:   No, I don't.

Mr. Bell:     Can you guess at what you've got?  She has - - you do have a savings, I understand.  Who is your savings account with?

[Decedent]   First Tennessee.

Mrs. Bell:    Is it a First Tennessee savings?

Mr. Bell:     Does she have a savings with anybody else?  No?  Do you know what you have in your checking accounts?

[Decedent]:   No idea.

Mrs. Bell:     She doesn't know.  Do you know?

[Ms. Pressnell][2]:     (Inaudible).

Mr. Bell:     Do you know how much money you have in your savings account?

[Ms. Pressnell]:     (Inaudible).

Mr. Bell:     Huh?

[Ms. Pressnell]:     (Inaudible).

Mr. Bell:     Do you have any money that - - do you know how much you have in your savings account?

[Decedent]:   No idea.  Not a whole lot.

Mr. Bell questioned Decedent about other assets, to which Decedent informed him that she had a vehicle and instructed him to leave the vehicle to Daughter.  Mr. Bell then questioned Decedent concerning the appointment of an executor.  A long colloquy occurred in which Decedent repeatedly requested the appointment of Ms. Pressnell or Mrs. Ferguson to serve as executor.  Mr. Bell advised Decedent to select her nurse, Tina Vincent, as executor.  Decedent again selected Mrs. Ferguson, to which Mr. Bell responded as follows:

Mr. Bell:     She's an heir also.  We want somebody that's not an heir.

Mrs. Bell:     Somebody that you're not leaving anything to.  Do you understand?

[Decedent]:   (Inaudible).

Mr. Bell:     I heard that.

_____

[2] This speaker was listed as unidentified in the record; however, Mrs. Bell testified that Ms. Pressnell was the fourth voice on the recording.

[Ms. Pressnell]:    She's getting tired.  It's a lot to understand.

Mr. Bell:    Do you have another choice other than Jewell or her daughter?

[Ms. Pressnell]:    She was nice to you down there that day.

[Decedent]:   Who?

[Ms. Pressnell]:    Tina.

* * *

Mr. Bell:    (Inaudible).  I'll help with it, you know.  But you've got to tell me who you want me to put in there.  So you've got to tell me so I'll know what to put in the will.  Do you understand?  Do you understand what I'm telling you?

[Decedent]:   Yes.

Mr. Bell then advised Decedent to tear her prior will "to pieces" and continued:

Mr. Bell:    You need to tell your daughter later on after we get this will done - -

[Decedent]:   (Inaudible).

Mr. Bell:    - - that you got a new will and she might as well bring you hers back because it's no longer any good.

[Decedent]:   (Inaudible).

Mr. Bell:    Do you understand me?

[Decedent]:   Yes.

Mr. Bell:    Now have you thought anymore about who you want to name as the executrix of your will?

[Decedent]:   (Inaudible).

Mr. Bell:     I'll tell you what, you think about that and we'll call you after awhile.

[Ms. Pressnell]:     We'll think about it, too, and then I'll call.

Mr. Bell:     (Inaudible).

[Ms. Pressnell]:     We don't know anybody else to put down but Tina.

Mr. Bell:     Well, she said awhile ago she didn't want to put Tina.  I don't want to put somebody she don't want.

* * *

Mr. Bell:     (Inaudible).  Okay.  Now, have you got any other property that you want (inaudible) to have?  What about your household furnishings, who do you want to have those?

[Decedent]:   Jewell.

Mr. Bell:     Jewell?  Jewell, you're going to come out smelling like a rose.  Okay do you have anything else - -

[Ms. Pressnell]:     (Inaudible).

* * *

Mr. Bell:     So your daughter is the only relative you've got, right?

[Decedent]:   Yes.

Mr. Bell:     And you don't trust her?

[Decedent]:   No.

Mr. Bell:     All right.  I understand.  Can you think of anything else you want me to put in your will?

[Decedent]:   No.

Mr. Bell:      If you do, you think about it and Jewell calls me and she can tell me.

[Decedent]:   Okay.

Mr. Bell:      Okay?  I don't think she understood me.

Mrs. Bell:     Yes, she did.  She said okay.

* * *

Mr. Bell:      I left a card here for you and one for Jewell so that you can call me, okay?

[Decedent]:   Uh-huh.

Mr. Bell:      And we'll do what - - we'll try to do what you want.  That's what we're here for, okay?

[Decedent]: (Inaudible).

Mr. Bell:      Did she understand that?

[Ms. Presnell]:      (Inaudible).

Mr. Bell:      (Inaudible)

[Ms. Presnell]:      (Inaudible).

Mr. Bell:      Do what?

[Ms. Presnell]:      (Inaudible).  Let's get it done.  Just get it done.  Just go ahead and tell him to put Tina.  (Inaudible).

Mrs. Bell claimed that Ms. Pressnell did not pressure Decedent and that Ms. Pressnell was standing on the other side of the room until Mr. Bell questioned Decedent about the selection of an executor.  She drafted the will that night.  Ms. Pressnell called the next morning and advised her that Decedent had been taken to Tennova.

Mrs. Bell testified that she retrieved Ms. Cabage and Ms. Heiser on her way to Tennova.  Upon their arrival, Ms. Pressnell met them in the lobby and escorted them to

Decedent's room, where Decedent signed in the presence of Mrs. Bell, the witnesses, and Ms. Pressnell. Mrs. Bell claimed that Decedent recognized her and knew why she was there in her room. She noted that Decedent was more alert on that day than she was the day before when they discussed the terms of the will. She claimed that the will accurately reflected Decedent's desires and instructions provided to them.

The will, introduced and admitted as an exhibit, provided for the selection of Ms. Pressnell and Tina Vincent[3] as co-executrixes and Mrs. Ferguson as a replacement executrix. The will provided for the sale of Decedent's real property after death and for the proceeds to be divided in three equal portions to Ms. Pressnell, Mrs. Ferguson, and Daughter. The will further devised all motor vehicles to Daughter and all personal property to Ms. Pressnell and Mrs. Ferguson, including all household goods, furnishings, cash, banking accounts, stocks, bonds, securities, or any other personal property.

Ms. Vincent testified that she was employed by Decedent's primary care physician, Dr. Brad Flaming, as a certified medical assistant. She recalled Decedent's extensive medical history but noted that Decedent never presented as mentally incompetent. She claimed that Decedent never mentioned Daughter or advised her that she had any children. She recalled that at some point in 2014, Decedent, along with Ms. Pressnell and Mrs. Ferguson, requested a referral for an attorney to update Decedent's will. She recommended Mr. Bell and provided them with his phone number.

Arnold Cohen, a licensed attorney, testified that Daughter contacted him and requested his assistance in drafting powers of attorney for Decedent. Daughter advised him of her concern that another woman was keeping her from Decedent. He drafted a health care power of attorney and a durable power of attorney, and his assistant accompanied her to NHC to meet with Decedent.[4] He recalled that Ms. Pressnell contacted him at some point and requested his legal assistance.[5] He advised her that he could not represent her because he represented Daughter.

Detective Jeremy McCord testified that he has been employed by the Knox County Sheriff's Department since 2007. He recalled meeting with Daughter in August

---

[3] Ms. Vincent was ultimately selected as an executor; however, she declined to serve in that capacity upon Decedent's passing.

[4] Mr. Cohen's assistant, Cecilia Sheehan, confirmed that she accompanied Daughter to NHC on July 17, 2014, to obtain Decedent's signatures for two powers of attorney and a codicil to Decedent's will. She provided that Decedent spoke with Daughter and another individual who accompanied them. However, Decedent did not sign the documents.

[5] Mrs. Ferguson testified that she called Mr. Cohen, not Ms. Pressnell.

2014 to discuss Decedent's relationship with Ms. Pressnell. He stated that Daughter suspected that Decedent was subject to financial and physical abuse. He met with Decedent on August 12, 2014, but ultimately found the complaint unfounded. He described Decedent as "calm and pleasant, very lucid." He explained that Decedent claimed that she had the same will "for years" and that the will had not been altered since Ms. Pressnell obtained a power of attorney. He agreed that Ms. Pressnell was present for a portion of the interview and did not correct Decedent's statement concerning the will. He recalled that Ms. Pressnell claimed that she obtained permission before accessing Decedent's accounts and never used the accounts for her own benefit. He stated that he was advised during the meeting that Daughter had been physically abusive toward Decedent and that Daughter sought to secure a power of attorney for financial gain. Based upon the information he received, he advised personnel at Elmcroft, NHC, and Tennova to deny any attempt by Daughter to contact Decedent. He further advised Daughter that Decedent did not want further communication or contact with her.

Suzanne Wheeler Artomovich testified that she is employed by Rural/Metro AMR as an advanced Emergency Medical Technician. She transported Decedent by ambulance from Elmcroft to Tennova on August 8, 2014. She recalled that Decedent could not walk well and had low vital signs at approximately 8:51 p.m. She noted that the nurse advised her that Decedent was not eating or drinking and was inactive. She reviewed Decedent's chart, which noted a history of dementia and falls. She provided that she did not obtain Decedent's permission to provide treatment and transport because of her history as noted in the medical chart. She agreed that she did not know whether Decedent had actually been diagnosed with dementia. She stated that her care of Decedent ended at approximately 9:22 p.m., when she delivered her to Tennova.

Gary Muncey, who was 74 years old at the time of trial, testified that he has known Daughter's family for approximately 25 years. He described Daughter's relationship with Decedent as "a normal relationship" and denied every witnessing violent arguments or abuse of any kind between them. He stated that prior to April 2014, Decedent was self-sufficient and did not need assistance. He claimed that after Decedent's second fall and stroke in June 2014, she experienced a "steady deterioration, slow but steady." He recalled accompanying Daughter for "many visits" with Decedent during that time period. He provided that he observed Decedent pretend to take medication and then hide said medication from personnel at NHC. He claimed that around that time, she also became "very suspicious" of him and Decedent. He stated that he advised Daughter to obtain a power of attorney to aid in her care of Decedent.

Mr. Muncey said that he accompanied Daughter and Mr. Cohen's assistant to obtain Decedent's signature on the forms at NHC. He claimed that they spoke briefly with Decedent, who said that she was being moved to Elmcroft, but were unable to obtain

her signature. He further claimed that they were denied access to Decedent at Elmcroft and that Detective McCord instructed them to return items taken from her residence.

Daughter, who lives by herself and is disabled, testified that Decedent, her maternal aunt, adopted her at age ten following the death of her biological mother in a house fire. She explained that she resided with her grandparents at the time of the fire and remained there until the end of the school year when Decedent and her husband, Mr. Aslinger, adopted her. She then moved to Roanoke, Virginia to live with them. They remained there for three years before returning to Knoxville. Thereafter, she returned to live with her grandparents at Mr. Aslinger's request at the age of 13 or 14. She explained that they had frequent arguments concerning her refusal to eat vegetables. She married at the age of 15, and one child, a son, was born of the marriage. She later divorced her husband after he joined the Army and moved to Germany. She remained in Knoxville.

Daughter testified that Decedent and Mr. Aslinger moved around before ultimately returning to Knoxville after he had a stroke. Decedent retired upon their return to Knoxville and provided care for Mr. Aslinger, whose legs were amputated at some point, and her elderly mother. She recalled that Ms. Pressnell served the family as a paid sitter who sat with either Mr. Aslinger or Decedent's mother while Decedent ran errands or attended appointments. She claimed that she and Decedent met weekly for lunch and that Decedent also assisted her financially. She explained,

> [Decedent] wanted me up here closer with her, and I was living in Madisonville, and it's very hard to get in senior elderly housing because . . . there's always a waiting list. So I found an apartment up here and she helped me pay it.

She denied ever threatening Decedent, pressuring Decedent to provide for her financially, or writing checks without permission.

Daughter testified that Decedent called her from the hospital in April 2014 to inform her of the fall and resulting injuries. She confirmed that Decedent eventually returned home until she suffered from another fall and then a stroke. She stated that she believed Decedent's injuries and her account of their cause were suspicious. She contacted the police and expressed her concerns. She also met with Mr. Cohen to secure a power of attorney to assist Decedent further.

Daughter claimed that the staff at NHC prevented her from obtaining Decedent's signature and informed her that Ms. Pressnell had already secured a power of attorney. Further, Detective McCord questioned her regarding allegations of her abuse of Decedent and improper use of Decedent's checking account. She denied wrongdoing and

- 13 -

explained that the altercation mentioned occurred when she was 13 or 14 years old. She claimed that he advised her that he would put her in jail if she contacted Decedent. She heeded his instruction and did not attempt to contact Decedent. She agreed that she did not seek legal recourse and also never contacted Ms. Pressnell to inquire about Decedent's health. She stated that she was not informed of Decedent's whereabouts, her hospital stay in August 2014, or her passing on February 3, 2015, despite the fact that Ms. Pressnell had her telephone number.[6] She finally learned of Decedent's passing on March 5 when Mr. Bell contacted her regarding the will.

Ms. Pressnell, a widower who was 86 years old at the time of trial, testified that she has worked for Decedent for approximately 30 years as a caregiver in various capacities for different family members, including Decedent as she went through chemotherapy treatments. She provided that she continued her friendship with Decedent even after Decedent's health improved and Decedent's mother and husband passed away. She talked with Decedent on a daily basis and considered her a best friend but admitted that her services as a caretaker were no longer needed. She identified a plethora of cards from Decedent to her, documenting their lifelong friendship.

Relative to Daughter, Ms. Pressnell claimed that Daughter never visited Decedent while she was present. She noted that Decedent wrote her own obituary that did not include Daughter as a named relative. She further provided that Daughter was also not included in Mr. Aslinger's obituary, also drafted by Decedent. She identified a prior will, dated August 31, 1970, a few years following Decedent's adoption of Daughter, which did not include Daughter as a beneficiary. She claimed that Decedent later tore a copy of the September 2005 will in which Daughter was a named beneficiary. She asserted that she then accompanied Decedent to her home, where Decedent searched for the original copy. She denied ever contacting Mr. Cohen to draft a new will for Decedent or ever contacting Daughter to discuss the September 2005 will.

Ms. Pressnell admitted that she obtained powers of attorney for Decedent. She explained that the personnel at NHC advised Decedent to select someone to serve in that capacity and that they provided the forms for Decedent to sign on July 8, 2014.[7] She denied any suggestion that she asked to secure powers of attorney. She acknowledged that she later secured additional powers of attorney from attorney Michael DeBusk. She explained that an employee at Decedent's bank advised her that she needed an additional power of attorney for Decedent's finances. She claimed that Decedent directed her to

---

[6] She claimed that Ms. Pressnell called her in July 2014 and talked to her for approximately 40 minutes concerning Decedent's will.

[7] Records from NHC were admitted to establish that Ms. Pressnell presented the powers of attorney to personnel at NHC. Ms. Pressnell continued to claim that NHC provided the documentation to her.

secure the necessary documentation and that the document was signed on August 1, 2014. She noted that the documents were later re-signed on December 11 because a page was missing from the original document. She acknowledged that in her response to Daughter's interrogatories, she claimed that the durable power of attorney was not executed until December 11.

Ms. Pressnell denied influencing or pressuring Decedent concerning the drafting of the will and claimed that she contacted Mr. Bell at Decedent's request. She agreed that she advised Mrs. Bell that Decedent needed a will and sought to name her and her daughter as beneficiaries. She further agreed that she was present when Mr. and Mrs. Bell interviewed Decedent for the drafting of the will. She claimed that she was not listening or engaged in the conversation and denied responding to questions asked during the interview. She acknowledged that she previously denied that she was even present for the interview but claimed that she was "really sick" during her deposition.

Ms. Pressnell acknowledged that Decedent was not feeling well on August 8 but that Decedent acted well because she did not want to be sent to the hospital. She agreed that Decedent was rushed to Tennova that night and that Decedent would not have survived the night had she not been taken to the hospital. She claimed that she stayed with Decedent until 12:00 a.m. and only left when Decedent was feeling "much better." She acknowledged that she spoke with Mrs. Bell the next morning and advised her that Decedent was in the hospital. She agreed that she was present when the will was executed but claimed that she was not concerned with the signing of the will.

Ms. Pressnell denied that she was present when Detective McCord asked Decedent whether her will had been changed. She claimed that she would not have advised him about the new will even if she had been present. She explained that she would never "cross" Decedent or correct her.

Ms. Pressnell acknowledged that she did not inform Daughter that Decedent was residing with Mrs. Ferguson because Decedent did not want Daughter to know her whereabouts. She claimed that she later contacted Daughter and left a message informing her of Decedent's death. She identified the inventory of Decedent's estate filed with the probate court, reflecting Decedent's bank account balance of $206,020, stocks valued at $267,683, and additional personal property valued at $3,598.

Mrs. Ferguson testified that she has known Decedent for approximately 27 years. She first helped her by caring for Decedent's mother on occasion. Decedent no longer needed her help once her mother passed away; however, she remained friends and treated Decedent like family. She described a sisterly relationship between Decedent and her mother and identified several photographs of Decedent with her and other family

members, including Ms. Pressnell. She also identified a picture of Decedent on the day Decedent signed the will. She explained that the photograph was taken while Decedent was visiting with two of her former co-workers.

Mrs. Ferguson testified that she contacted Mr. Cohen, not Ms. Pressnell. She explained that Decedent asked her to contact him because she wanted to make changes to her will. She agreed that Mr. Cohen advised her that he could not speak with her because he represented Daughter.

Mrs. Ferguson testified that Decedent was afraid of Daughter and Mr. Muncey. She stated that Decedent described incidents where Daughter and Mr. Muncey came to her home and made her write checks for them. Decedent also advised Mrs. Ferguson that Daughter slapped her during one of the visits. She admitted that she initially testified in her deposition that Daughter slapped Decedent when Daughter was a child. She explained that Decedent advised her of other physical altercations, not just the incident when Daughter was a child. She claimed that Decedent also claimed that Daughter threatened her and told her that Mr. Aslinger was the father of her child. She explained,

> [I]t was after [Mr. Aslinger] passed away. That's when [Daughter] came back in the picture trying to make [Decedent] do everything for her. She wanted her son to have the Aslinger name.[8]

Mrs. Ferguson testified that Decedent moved into her home on October 4, 2014. She stated that Decedent resided in a bedroom downstairs that did not have a working bathroom at the time. Decedent paid for the installation of a bathroom and also remitted payment for her accommodations at a rate of $100 per day.[9] She agreed that Decedent received home health services but claimed that she also assisted her when needed.

The video depositions of Mark T. Weaver, M.D. and Stanley L. Miller, M.D. were played to the jury. The deposition of Brad Alan Flaming, M.D. was read into the record. Dr. Weaver, an internal medicine physician, testified that he provided treatment for Decedent on the night of August 8 and morning of the 9th as the hospitalist physician. He stated that he admitted Decedent from the emergency room into the hospital between 11:30 p.m. and 12:00 a.m. for renal failure and a urinary outlet obstruction. He agreed that Decedent knew her name but claimed that she was unable to answer questions with any clarity and was not oriented as to place, time, and situation. He claimed that she did not have the requisite mental capacity to make a competent business decision at that specific time. He noted that her medical records also mentioned a possible diagnosis of

---

[8] In rebuttal, Daughter denied ever advising Decedent that Mr. Aslinger was the father of her child.

[9] She did not report these payments as income for tax purposes.

dementia. He agreed that her mental condition could have improved following the treatment she received for renal failure and dehydration.

Dr. Miller, a gastroenterologist, testified that also he provided treatment for Decedent at Tennova on August 9 at some point prior to 11:42 a.m., when he dictated his care of Decedent. He explained that he generally dictates his interactions within 15 to 20 minutes of treating the patient. He claimed that Decedent was unable to give him her medical history and was unaware of her need for treatment for rectal bleeding. He agreed that she answered some questions with clarity but asserted that she had no real idea why she was in the hospital. He provided that following his exam, he noted three diagnostic type impressions, (1) rectal bleeding due to fecal impaction; (2) microcytic anemia; and (3) dementia. He explained that he based the impression of dementia on the fact that she was unable to answer questions appropriately. He agreed that he is a gastroenterologist, not an expert in the area of dementia.

Dr. Flaming testified that he has served as Decedent's primary care physician since May 1995. He agreed that Daughter and Mr. Muncey came to his office at some point in 2014 and requested Decedent's medical records. His office refused the request. He claimed that Decedent had "very negative" feelings toward her daughter and felt that she was of not of any help to her. He reviewed Decedent's extensive medical history and noted that she reported memory problems as early as April 2004. His notes also indicated a possible diagnosis of depression with memory loss and cortical dementia. However, he claimed that he believed Decedent was of sound mind throughout the 20 years he provided treatment, including when he last provided treatment on January 23, 2015, for weakness, malnourishment, and bedsores. He agreed that he did not provide treatment on August 9, 2014, and had no reason to question the accurateness of another doctor's notations. He further agreed that documentation from Elmcroft provided that Decedent was given a dementia related diagnosis and that she was disoriented to person, place, and self from July 21 through August 9, 2014.

Following the presentation of the above evidence, the case was submitted to the jury, which found that Decedent was not competent to execute the 2014 will due to undue influence or mental incapacity. The court entered an order confirming the jury's finding and deeming the will null and void. This timely appeal followed.

## II.  ISSUE

The sole and determinative issue on appeal is whether there is material evidence in the record to support the verdict.[10]

## III.  STANDARD OF REVIEW

In reviewing a jury verdict, "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict."  Tenn. R. App. P. 13(d).  When this court reviews a judgment based on a jury verdict, we are limited to determining whether there is material evidence to support the verdict.  *Forrester v. Stockstill*, 869 S.W.2d 328, 329 (Tenn. 1994).

## IV.  DISCUSSION

As a threshold argument, Daughter asks this court to dismiss the appeal because Representatives failed to submit a brief that complied with the Tennessee Rules of Appellate Procedure.  We agree that the brief is lacking, in many respects; however, we respectfully deny the requested dismissal.

Next, we must address the fact that Representatives have attempted to, at trial and now on appeal, disparage Daughter because she was adopted and not born to Decedent.  We reject this implication.  *See* Tenn. Code Ann. § 36-1-121(a) (providing that the signing of a final order of adoption establishes a parent-child relationship as if the child had been born to the adoptive parent); Tenn. Code Ann. § 36-1-121(b) (providing that an adopted child is "capable of inheriting and otherwise receiving title to real and personal property from the adoptive parents and their descendants" whether by will or other instrument).  Any attempt to question Daughter's ability to inherit from Decedent as a result of her adoption is misplaced and in derogation of established law in this state.  Having established this fact, we now proceed to our review of whether the verdict is supported by material evidence.

In short, the material evidence presented overwhelming supports the jury's verdict.  Here, Ms. Pressnell obtained an unrestricted power of attorney prior to a change in Decedent's will that provided specific bequests of great value to her and Mrs. Ferguson.  It is well established in Tennessee that "a confidential relationship arises as a matter of

---

[10] Representatives also take issue with the jury instructions; however, any issue pertaining to the instructions is waived because they did not file a motion for new trial.  *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issue[] will be treated as waived.").

law when an unrestricted power of attorney is granted to the dominant party." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). The routinely recognized presumption is that when a confidential relationship exists and the dominant party receives a benefit from the other party that the dominant party used undue influence to obtain the benefit. *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1997); *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995); *Hogan v. Cooper*, 619 S.W.2d 516, 519-20 (Tenn. 1981). The determination of whether the dominant party exerted undue influence is a question of fact. *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *9 (Tenn. Ct. App. Mar. 17, 2009). Where a presumption of undue influence arises, it may be rebutted only by clear and convincing evidence. *Matlock*, 902 S.W.2d at 386. Accordingly, Ms. Pressnell had the burden to prove by clear and convincing evidence that the changes in the will were of Decedent's own free will and not a result of her influence.

The record is replete with information establishing Ms. Pressnell's undue influence of Decedent. Ms. Pressnell arranged the meeting with Mr. Bell, participated in the discussion, directed the selection of the executrix in an attempt to "[j]ust get it done," and even arranged for the signing of the will the following day after Decedent had been rushed to the hospital. Ms. Pressnell then isolated Decedent by arranging for her transfer to Mrs. Ferguson's home, where Decedent was charged $100 per day to reside there and also paid for improvements to the home months prior to her death.

Additionally, the testimony presented also supported a finding of mental incompetence. A valid will is a product of the free exercise of independent judgment by a person who has the mental capacity to make a testamentary disposition. *In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987). A will contest "calls into question the testator's mental capacity to execute a will and accordingly requires the trier of fact to determine whether the testator knew the natural objects of his or her bounty and comprehended the extent of his or her property and the manner of its distribution." *In re Estate of Eden*, 99 S.W.3d 82, 89-90 (Tenn. Ct. App. 1995) (citations omitted). Here, Decedent exhibited signs of confusion during the interview with Mr. Bell and was unable to provide a proper accounting of her assets. Her treating physicians, Drs. Weaver and Miller, also noted her lack of mental capacity hours prior to her signing of the will.

While we agree that evidence was presented to establish Decedent's lifelong friendship with Ms. Pressnell, a rift in the relationship between Decedent and Daughter, and evidence that Decedent was of sound mind when she executed the will, the jury reached an opposite result. As this court has previously noted, "if there is material evidence to support the verdict, the verdict and judgment must be affirmed, even if there is testimony or evidence supporting the appellant's position." *Dixon v. Cobb*, No. M2006-00850-COA-R3-CV, 2007 WL 2089748, at *4 (Tenn. Ct. App. July 12, 2007)

(citing *City of Chattanooga v. Ballew*, 354 S.W.2d 806, 806 (Tenn. Ct. App. 1961)). Having reviewed the record, we conclude that the testimony presented at trial provided material evidence for a jury to invalidate the will as a result of undue influence and as a result of the lack of the requisite mental capacity.

## V.    CONCLUSION

We affirm the decision of the trial court and remand the case to the trial court for enforcement of the court's judgment and for collection of costs assessed below. Costs of the appeal are taxed equally to the appellants, Jewell O. Pressnell and Betty J. Ferguson, for which execution may issue, if necessary.

_____
JOHN W. McCLARTY, JUDGE